[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/04/98
THOMAS K. KAHN
CLERK

_____

No. 97-3182

_____

D. C. Docket No. 96-2103-CIV-T-17B

EDWARD WILKINS; WILLIAM JENKINS, et al.,

Interveners-Plaintiffs
Appellants,

versus

COMMERCIAL INVESTMENT TRUST CORPORATION,
a New York Corporation, in personam,

Defendant,
Intervener-Defendant,
Cross-Claimant,
Third-Party-Plaintiff
Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(September 4, 1998)**

Before TJOFLAT, COX and HULL, Circuit Judges.

PER CURIAM:

This is an appeal concerning admiralty jurisdiction. We conclude that admiralty jurisdiction

is lacking.

**I. Background**

*A. Facts*

This action arises from the failed launching of a new cruise line. The defendant CIT

Group/Equipment Financing, Inc., (CIT) acquired the motor vessel *Sun*[1] at a foreclosure sale in the

Bahamas and then sought a buyer.[2] In early June 1996, CIT agreed in principle to a sale to Sun

Travel Investment Corporation, part of a group of affiliated corporations that included the proposed

charterer, Royal Venture Cruise Line, Inc., and a third corporation, Royal Shipping Management,

Inc. (collectively referred to as "the Royal companies"), which planned to operate the *Sun* as a cruise

ship.[3] The purchase agreement was developed through an agreed summary of proposed terms,[4] a

commitment letter,[5] and several amendments to these agreements.[6]

The deal that emerged was as follows. The purchase price of $25 million was to be mostly

financed by CIT, secured by mortgages on the vessel and a pledge of the contemplated charter and

of Royal Venture stock.[7] In addition, consideration for the sale included an initial investment by

---

[1] The ship has been renamed, but for convenience we will continue to use the old name. For similar reasons of convenience, we refer to CIT as the owner of the *Sun* even though title reposes in a CIT subsidiary. CIT has taken inconsistent positions in this litigation with respect to which subsidiary has title — an inconsistency of which the plaintiffs make much, but which is irrelevant to the issues at hand.

[2] (R.2-29 ¶ 3.)

[3] (R.3-42-Ex. D.)

[4] (*See* R.2-29-Ex. A.)

[5] (*See id.*-Ex. B.)

[6] (*See id.*-Exs. C, D, F.)

[7] (*See id.*-Ex. B.)

the Royal companies of up to $1.5 million to repair and refurbish the vessel.[8] The Royal companies would oversee the repairs and refurbishment, and the parties explicitly agreed that the Royal companies were uniquely responsible for all repair and refurbishment expenses (hereinafter called "the refurbishment expenses").[9] The Royal companies' payment for refurbishment expenses was to be guaranteed either by a letter of credit or by an escrow account, issued or opened before refurbishment began, to be available to CIT upon any default in payment by the Royal companies to refurbishers.[10]

The Royal companies began the refurbishment on July 7. As of late July, no Royal company had yet provided the required security, and CIT — worried that maritime liens on the vessel would result if the Royal companies defaulted on their obligations to refurbishers — threatened to end the transaction if security were not provided.[11] At the Royal companies' request, the plaintiff Edward Wilkins, an investor in the Royal companies, stepped in and posted an irrevocable letter of credit for $1.5 million. CIT could draw upon the letter upon certification that one of the Royal companies had failed to pay the refurbishment expenses for which it was responsible, and that a maritime lien would likely result. In exchange for Wilkins's posting the letter of credit, the Royal companies — reaffirming that they were responsible for payment of the refurbishment expenses — promised to

---

[8]      (*Id.*)

[9]      (R.3-42-Ex. C.)

[10]      (*Id*. at 2.)

[11]      (R.2-29 ¶¶ 8-10.)

open, for Wilkins's protection, an escrow account of up to $1.5 million to be funded by proceeds from a sale of securities.[12]

Royal Venture also sought help from Gary Kimball, another plaintiff here, who in turn recruited the plaintiffs other than Wilkins (whom we shall call "the investors") to provide varying amounts of cash to the Royal companies. In exchange, Royal Venture provided the investors with notes promising payment from Royal Ventures before certain dates in the fall of 1996 at an 18% interest rate.[13] At no point did CIT promise to reimburse any plaintiff here, and no plaintiff has any express lien on the *Sun*.

By October, it was evident that the Royal companies would not be able to raise enough capital to close the deal. CIT notified the Royal companies of their default under the purchase agreement, and CIT drew upon the letter of credit to pay off the debts that the Royal companies had incurred in refurbishing the *Sun*. The investors allege that their loans were also used to pay off maritime liens, although there is no evidence to that effect in the record — only conclusory affidavits.

### B.    Procedural History

This action began when a group of the *Sun*'s seamen sued CIT for wages. The plaintiffs (as we have been calling them here) moved to intervene and assert two claims against the *Sun* and CIT. In Count I, they sued the *Sun* and claimed maritime liens under 46 U.S.C. § 31342, in Wilkins's case

---

[12]    (R.2-29-Ex. *O*.)

[13]    (R.2-29-Exs. P-T.) The investors filed affidavits swearing that they lent the money to the *Sun*, and not to Royal Venture. (R.3-38-Exs.) How this testimony squares with the promissory notes from Royal Venture is unexplained, however, and indeed in his affidavit a CIT vice president who was involved in the transaction denies that CIT ever had any contact with the investors. (*See* R.2-29¶¶ 21, 24.)

4

because he furnished the letter of credit, and in the other plaintiffs' cases because they provided cash to the Royal companies, supposedly to pay refurbishment expenses. In Count II, they sued CIT and the *Sun*, claiming fraud by CIT or the vessel.[14] The plaintiffs were permitted to intervene; the seamen who were the original plaintiffs have been dismissed from the case following settlement.

CIT moved to dismiss the Count II fraud claim on the ground of lack of admiralty jurisdiction. While this motion was pending, the plaintiffs moved for partial summary judgment on their maritime lien claim. CIT opposed this motion in part on the ground that no maritime jurisdiction existed over the maritime lien claim. The district court agreed and dismissed the action for want of subject matter jurisdiction. Although the plaintiffs briefly mentioned diversity as an alternative basis for jurisdiction in their response to the motion to dismiss, the district court did not explicitly consider it. The plaintiffs now appeal the dismissal of the action, arguing that either admiralty or diversity jurisdiction exists to hear their claims. Our standard of review is de novo. *See Ambassador Factors v. Rhein-, Maas-, und See- Schiffahrtskontor GMBH*, 105 F.3d 1397, 1398 (11th Cir. 1997).

## II.  Discussion

Maritime jurisdiction is a prerequisite to a claim against a vessel asserting a maritime lien. *See E.S. Binnings, Inc. v. M/V Saudi Riyadh*, 815 F.2d 660, 662 (11th Cir. 1987), *overruled in part on other grounds*, *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S. Ct. 2071 (1991). Thus, whether maritime jurisdiction exists is a question anterior to, although often coincident with,

---

[14]     The exact theory of this claim is not clear from the complaint, but it seems that the alleged fraud is that CIT failed to tell Wilkins and the investors of the circumstances in which the letter of credit might be drawn upon, or the investors' loans spent. (*See* R.3-42 ¶¶ 37-40.)

the question of whether the plaintiff has a maritime lien. *See The Resolute*, 168 U.S. 437, 439-40, 18 S. Ct. 112, 113 (1897); *Inbesa America, Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 & n.2 (11th Cir. 1998); *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 912 (9th Cir. 1996). Count I's maritime lien claim is rooted in contract, so jurisdiction is determined by the general rule for admiralty jurisdiction in contract: for jurisdiction to exist the subject contract must be wholly maritime in nature, or any nonmaritime elements must be either insignificant or separable. *See Inbesa*, 134 F.3d at 1036. A maritime contract in general is one whose subject matter "is necessary to the operation, navigation, or management of a ship," *id.* (quoting *Ambassador Factors*, 105 F.3d at 1399), and precedent has defined categories that provide useful boundary posts for the line between maritime and state-law-governed contracts. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S. Ct. 886, 890 (1961).

There are many agreements in the facts of this case, both express and implied. The plaintiffs urge us to base jurisdiction on the agreements between Royal Venture and the suppliers who furnished goods and services for the *Sun*'s refurbishment. Such contracts are maritime, as they are for repair of a vessel. *See North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 128, 39 S. Ct. 221, 224 (1919). A murkier issue, however, is whether the plaintiffs' *in rem* claims asserting maritime liens can rest at all on these refurbishment contracts. The plaintiffs argue that their claims are based on these contracts, even though they are not parties to the contracts, because of the maritime rule of advances: "A creditor who advances money specifically for the purpose of discharging a maritime lien is subrogated to the lienor's rights." *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1207 (5th Cir. 1978); *see Crustacean Transp. Corp. v. Atalanta Trading Corp.*, 369 F.2d 656, 660 (5th Cir. 1966). The money Wilkins paid through the letter of

credit, and the money the investors put up, assertedly ended up (after passing through some intermediaries' hands) paying off the refurbishers, who were potential lienors of the *Sun*. Thus, the plaintiffs are, in their opinion, subrogated to the suppliers' rights. Since jurisdiction would exist to entertain an *in rem* claim by one of the suppliers, the plaintiffs reason, jurisdiction exists to hear a claim by one subrogated to the lienors' rights.

We are unpersuaded because the plaintiffs cannot benefit from the rule of advances. Not just any creditor whose money goes to discharge maritime liens himself acquires a maritime lien. Rather, the advance must be on the credit of the vessel. *Tramp Oil & Marine, Ltd. v. M/V "Mermaid I"*, 805 F.2d 42, 45 (1st Cir. 1986). This qualification carries with it a common-law presumption that anyone making advances to provide necessaries to a vessel does so on the vessel's credit, and not merely on the credit of any individual. *See The Emily Souder*, 84 U.S. (17 Wall.) 666, 671 (1873); *The Cimbria*, 214 F. 128, 129 (D.N.J. 1914); *cf.* 46 U.S.C. § 31342(a)(3) (providing that an alleged lienor, to whose rights a creditor may become subrogated, need not prove that credit was given to the vessel). The origin of the presumption is common sense about the paradigmatic loan to the master of a foreign ship who needs the money to keep going: "Moneys are not usually loaned to strangers, residents of distant and foreign countries, without security, and it would be a violent presumption to suppose that any such course was adopted when ample security in the vessel was lying before the parties." *The Emily Souder*, 84 U.S. (17 Wall.) at 671. But two circumstances of this case together remove it so far from the paradigm that indulging this ancient common-law presumption is unjustified.[15]

---

[15]     We are aware that at least one circuit has implicitly considered the rule of advances to arise from 46 U.S.C. § 31342, which contains a mandatory presumption that credit is extended to the vessel. *See* 46 U.S.C. § 31342(a)(3); *International Seafoods of Alaska, Inc. v.*

The first circumstance is that the very purpose of the advance was to satisfy the purchaser's contractual obligation to protect the vessel owner from maritime liens. CIT shifted the responsibility of paying maritime suppliers to the Royal companies. Thus, CIT was vulnerable to a default beyond its control. Fearing this possibility, from day one of this transaction CIT took every possible measure to protect itself from the possibility that the Royal companies' default would leave any liens on the vessel that would either be superior to CIT's purchase-money mortgage (if the sale closed) or impede a future sale (if the deal with the Royal companies fell through). Indeed, it was only because CIT insisted on enforcing its rights to protection that Wilkins and the investors participated in the transaction. With this background, it would be unjust to presume that the vessel would end up encumbered, anyway — because of the Royal companies' apparent default in reimbursing their investors as well as the vessel's refurbishers.

The second circumstance is that the advances were made not to, or on behalf of, the owner, the vessel, or their agents. Rather, the advances were at the instance of, and with promise of reimbursement from, a party with no property interest in any vessel — the Royal companies. In the paradigmatic case, the advancer deals with the owner or his agent, and the advance is either straight to the owner or to a lienholder, on the owner's behalf. *See, e.g.*, *Sasportes*, 581 F.2d at 1209; *Crustacean Transp. Corp.*, 369 F.2d at 659; *International Seafoods of Alaska, Inc. v. Park Ventures, Inc.*, 829 F.2d 751, 753 (9th Cir. 1987); *Pavlis v. Jackson*, 131 F.2d 362, 365 (5th Cir. 1942). Here,

---

*Park Ventures, Inc.*, 829 F.2d 751, 753-54 (9th Cir. 1987). We disagree; the statute says nothing about the rule of advances, and the rule has a long common-law history, as the cases we cite show. While the rule of advances may be a corollary in some sense to § 31342, its elements are independent of the statute and susceptible to judicial change to reflect the economic realities of a case. *Cf. Sasportes*, 581 F.2d at 1209 (borrowing into the rule of advances the high standard of § 31342's rebuttable presumption that credit is extended to the vessel).

the Royal companies, not CIT, sought out Wilkins and the investors in order to complete the sales transaction. Indeed, only Wilkins and Kimball had any contact with CIT at all. And before advancing money, the plaintiffs secured promises of reimbursement from the Royal companies. Wilkins purchased the letter of credit only after Royal Venture promised to open an escrow account available to Wilkins if the letter of credit were drawn upon.[16] The investors, for their part, all obtained promissory notes from the Royal companies. These two distinctions from the paradigm — who sought the advance and who agreed to pay for it — are important simply because in a case such as this one, where investors pay on behalf of a corporation that owns no vessel, potential collateral in the form of the vessel is not "lying before the parties." *The Emily Souder*, 84 U.S. (17 Wall.) at 671.

Because of these important distinctions from the typical advance case, we hold that the presumption that money is advanced on the credit of the vessel does not apply. There is no substantial evidence to support such a finding without the presumption, only conclusory statements by the plaintiffs in their affidavits. This mere scintilla of evidence is not enough. *Cf. Dolihite v. Maughon ex rel. Videon*, 74 F.3d 1027, 1046 (11th Cir. 1996) (conclusory statement in affidavit that doctor was negligent not enough to avoid summary judgment). This element of the rule of advances claim is thus missing, and Wilkins and the investors are not entitled to be subrogated to the

---

[16] It appears from the record that the escrow account was never provided; a letter from Royal Venture's chairman in October 1996 describes Wilkins as "an unsecured creditor of a company which is producing no income." (R.2-29-Ex. U.)

Interestingly, the agreement recites that "a portion of the consideration for the purchase of Vessel by Sun [Travel] is the establishment of a $1.5 million standby letter of credit with NationsBank." (R.2-29-Ex.*O*). If the letter of credit is so characterized, its purchase plainly does not grant Wilkins a maritime lien: advances for the purchase of a vessel do not give rise to a lien. *See The Sarah Harris*, 21 Fed. Cas. 447, 448, No. 12,246 (S.D.N.Y. 1874).

refurbishers' maritime liens. Wilkins and the investors accordingly may not rely on the refurbishers' contracts to furnish a basis for maritime jurisdiction under Count I. For this reason, we agree with the district court that maritime jurisdiction does not exist over the maritime lien claims asserted in Count I.

Jurisdiction over Count II, which claims fraud against the *Sun* and CIT, was not explicitly addressed by the district court. The fraud claims are plainly not, in any event, within the court's admiralty jurisdiction; torts fall within maritime jurisdiction only if they occur or have effects on navigable water, *see Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533, 115 S. Ct. 1043, 1048 (1995), and there is no evidence or assertion that any element of the alleged fraud was committed anywhere close to navigable water, or had any effect on water. *Cf. Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989) (reaching similar conclusion on similar facts).

On the other hand, the plaintiffs contend that jurisdiction may be based on diversity. This possibility was alleged in the complaint. But apart from a brief remark in response to CIT's motion to dismiss, the plaintiffs did not argue in the district court that diversity is a valid alternative basis for jurisdiction. The district court accordingly did not determine if diversity jurisdiction is available.

Rather than addressing the issue, we remand to the district court for it to consider in the first instance. A complete remand, however, is unnecessary. Diversity jurisdiction does not exist over Count I and the Count II fraud claim against the vessel; vessels may not be sued in diversity. *Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063, 1065 n.3 (5th Cir. Unit A May 11, 1981). The only claim here alleged that falls within diversity jurisdiction is that against CIT for fraud. We note that

10

the jurisdictional allegations relating to that claim are, however, incomplete as to citizenship.[17] Furthermore, for all it appears, six of the investors (F.H. Bell, Harry and Ruby Key, Louis and Claudette Lombardo, and Robert Major or Majors) claim less than the $50,000 minimum amount in controversy required by 28 U.S.C. § 1332(a) at the time the investors filed their complaint in intervention.[18] Whether the plaintiffs should be allowed to amend the complaint and whether diversity jurisdiction in fact exists over the complaint are questions we leave to the district court.

### III.  Conclusion

For the foregoing reasons, we affirm the dismissal for want of subject matter jurisdiction of the claims in Count I and the Count II claims against the *Sun*. We vacate the dismissal of the Count II claims against CIT and remand for the district court to determine whether diversity jurisdiction exists over these claims.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

[17]    The complaint does not allege, for instance, where CIT has its principal place of business or of what states some of the individual plaintiffs are citizens.

[18]    The plaintiffs' motion to intervene was granted November 26, 1996, and the complaint was filed that same day.  The amendment to § 1332(a) raising the required amount in controversy to $75,000 became effective January 17, 1997, 90 days after the amendment was enacted.  *See* Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 205(b), 110 Stat. 3847, 3850 (1996).