## HYUNDAI HEAVY INDUSTRIES CO., LTD., Plaintiff,

v.

## M/V SAIBOS FDS, in rem, Defendant.

### No. 01–0403–S.

United States District Court,
N.D. Alabama,
Southern Division.

June 20, 2001.

---

**ORDER**

STEELE, United States Magistrate Judge.

This matter is before the Court on the motions to dismiss the complaints, quash the warrant of arrest, release the vessel and award attorneys' fees and costs, (Docs.9–11), filed by Saibos Construccoes Maritimas, Lda ("Saibos"). (Doc. 7). The parties have filed briefs and evidentiary materials supporting their respective positions, (Doc. 12–13, 16–17), and the Court received oral testimony and further exhibits, as well as opening and closing arguments, at the hearing conducted June 14, 2001. At that time, the parties advised the Court that no further briefing, discovery or submission of evidence is required and that Saibos's motions are now ripe for resolution. For the reasons set forth below, the Court concludes that the motions to dismiss, quash and release are due to be granted and that the motions for award of attorneys' fees and costs are due to be denied.

## BACKGROUND

Saibos made the decision to acquire a deep-water, pipe-laying vessel. Saibos contracted with Samsung Heavy Industries ("Samsung") for the construction of such a vessel. Saibos contracted with AmClyde Engineered Products Co., Inc. ("AmClyde") to provide, inter alia, a "J–Lay tower" and a 600–ton crane for incorporation into the vessel. AmClyde in turn subcontracted certain of this work to the plaintiff Hyundai Heavy Industries Co. Ltd. ("Hyundai"), to the intervenor C.S.ONE Co. Ltd ("CSOne"), and to the intervenor Patrick Fabricating & Welding Enterprises, Inc. ("Patrick") (collectively, "the plaintiffs"). The plaintiffs performed work pursuant to their contracts but were paid only a portion of the contract price before AmClyde filed for bankruptcy in April 2001. The plaintiffs' verified complaints assert maritime liens for equipment and services provided pursuant to their contracts with AmClyde.

## DISCUSSION

The plaintiffs seek to invoke the Court's admiralty jurisdiction. Saibos moves to dismiss on the grounds that this Court lacks subject matter jurisdiction. Because this is a factual attack on the Court's jurisdiction, the Court may weigh the evidence and make findings concerning the jurisdictional facts, even if disputed. *E.g., Scarfo v. Ginsberg*, 175 F.3d 957, 960–61 (11th Cir.1999), *cert. denied*, 529 U.S. 1003, 120 S.Ct. 1267, 146 L.Ed.2d 217 (2000).

The parties agree that "the law of admiralty is well-settled that a contract for the construction of a vessel does not invoke the subject matter jurisdiction of the federal courts," while "[m]aritime jurisdiction does arise ... when a ship undergoes repairs." *Hatteras of Lauderdale, Inc. v. GEMINI LADY*, 853 F.2d 848, 849–50 (11th Cir.1988). They also agree that "[i]t is not always easy to determine what constitutes repairs as opposed to original construction." *The JACK–O–LANTERN*, 258 U.S. 96, 99, 42 S.Ct. 243, 66 L.Ed. 482 (1922). Saibos's motions hinge on the proper categorization of the plaintiffs' contracts.

Certain factual determinations important to the resolution of this issue are set forth below. For the most part, these facts are agreed or at least uncontroverted. All other facts found herein are supported by a preponderance of the evidence.

In December 1998, Saibos entered a contract with Samsung for the construction of a deep-water, pipe-laying vessel, including the incorporation of certain specialized equipment. In December 1998, Saibos also entered two contracts with AmClyde, one to furnish, inter alia, a J–Lay tower and the other to furnish a 600–ton crane. Saibos's contract with Samsung contemplated delivery of these items to Samsung's shipyard on Koje Island, Korea and incorporation into the vessel's hull at Samsung's shipyard prior to delivery. The vessel is incapable of its intended use of laying deep-water pipe without the J–Lay tower being installed and fully operational.[1]

The J–Lay tower weighs 2000 tons and represents several million dollars of the Saibos–AmClyde contracts. In January 2000, AmClyde entered a subcontract with Hyundai to provide the J–Lay tower. Saibos's contracts called for delivery of the J–Lay tower to Samsung's shipyard in staggered shipments of various segments. Due to delays by Hyundai and/or AmClyde in providing the segments, Saibos decided to complete assembly at Atlantic Marine in Mobile rather than at Samsung's shipyard.

---

1. The vessel can perform its intended function without the 600–ton crane, but its absence would reduce the length of pipe that could be handled from 48 meters to 12 meters.

Saibos modified its contract with Samsung to reduce the scope of work accordingly and also modified its contract with AmClyde so that only the shell of the J–Lay tower was provided in Korea, and that as a unit. AmClyde arranged to have tower components, originally to be supplied in Korea, supplied domestically, including through Patrick.

To ensure the vessel could safely navigate to Mobile, the vessel underwent sea trials in November 2000. She was christened as "SAIBOS FDS" on November 28, 2000 and delivered by Samsung and accepted by Saibos on December 7, 2000. On December 28, 2000, she received a certificate of interim class from Det Norske Veritas, subject to certain terms and conditions, including having trim and stability calculations approved and installing and properly testing the J–Lay tower and missing equipment. Except for the sea trials, the vessel remained at Samsung's shipyard until January 22, 2001.

On December 16 and 18, 2000, AmClyde entered agreements with CSOne to provide certain services in fulfillment of AmClyde's obligations under its contracts with Saibos. Virtually all of this work was completed, at Samsung's shipyard, prior to January 22, 2001.

In late December 2000, AmClyde contacted Patrick regarding materials and equipment to be furnished for the vessel in Louisiana. Patrick began invoicing AmClyde on January 16, 2001. The last shipment date reflected on Patrick's invoices is April 12, 2001.

On January 22, 2001, the SAIBOS sailed from Samsung's shipyard for Ulsan, Korea, a voyage of several hours. Hyundai completed virtually all its work on the J–Lay tower prior to January 22, 2001. On January 26, 2001, the incomplete J–Lay tower was brought aboard ship and stored as cargo as the SAIBOS sailed to Mobile under its own power, arriving at Atlantic Marine on or about March 6, 2001.[2] More components for the J–Lay tower were there supplied by AmClyde, and Atlantic Marine installed the J–Lay tower by permanent attachment to the vessel. The installation of the tower was necessarily completed sometime after Patrick's last provision of materials for the tower. As of today, the vessel is still at Atlantic Marine, awaiting sea trials scheduled to begin June 24, 2001.

 Admiralty jurisdiction may be based on contract or tort. If the latter, the existence of admiralty jurisdiction depends on both the locality of the wrong and whether it bears a significant relationship to traditional maritime activity. *E.g., Bunge Corp. v. Freeport Marine Repair, Inc.,* 240 F.3d 919, 923–24 (11th Cir.2001). The plaintiffs' claims, however, are based on contract. In such cases, admiralty jurisdiction exists only if the contract is maritime in nature, that is, if the contract "ha[s] reference to maritime services or maritime transactions." *North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919). The contract must be wholly maritime or else the non-maritime aspects must be either insignificant or severable. *Wilkins v. Commercial Investment Trust Corp.,* 153 F.3d 1273, 1276 (11th Cir.1998).

"The boundaries of admiralty jurisdiction over contracts ... being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Nevertheless, "precedent has defined categories that provide useful boundary points for the line between maritime and state-law governed

---

**2.** The 600–ton crane was installed before the SAIBOS sailed for Mobile.

contracts." *Wilkins v. Commercial Investment Trust,* 153 F.3d at 1276. One of these boundary points holds that a contract for the construction of a vessel is not maritime while a contract for the repair of a vessel is maritime. The dividing line between contracts to construct a vessel and contracts to repair a vessel is superficially simple: A contract to work on a proposed vessel is one for construction, while one to work on a vessel in existence is one for repair.

> A ship *in esse* as a maritime subject gives a maritime character to all transactions directly connected with it. The cases are distinguishable thus: One class, founded upon contracts for the repairing and rebuilding of vessels, holds such contracts to be maritime, because they affect vessels *in esse;* and the other class, founded upon contracts for the building of proposed vessels, holds such contracts to be non-maritime, because they touch maritime subjects only by relation to proposed vessels, the future existence of which is contingent upon performance of the terms of the contract in each case.

*Hatteras of Lauderdale v. GEMINI LADY,* 853 F.2d at 850 (quoting *The Manhattan,* 46 F. 797, 799–800 (D.Wash.1891))(emphasis in original). The thornier issue is at what point the structure comes into legal existence as a "vessel."

At least since 1919, the Supreme Court has recognized two benchmarks as necessary to bring a vessel into legal existence for purpose of distinguishing construction contracts from repair contracts: "The structure does not become a ship, in the legal sense, until it is *completed* and *launched.*" *North Pacific Steamship v. Hall Brothers Marine Railway,* 249 U.S. at 127, 39 S.Ct. 221 (emphasis added). A year later, the Supreme Court clarified what is meant by the requirement that the vessel be "completed." In *Thames Tow-boat Co. v. The Schooner FRANCIS MC-DONALD,* 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920), the Court held that a contract to work on a vessel "not sufficiently advanced to discharge the functions for which intended" or not yet in a "condition to function as intended" is not maritime in nature. *Id.* at 243, 245, 41 S.Ct. 65.

■ Using the Supreme Court's test, it is clear that the vessel here was not "completed" before installation of the J–Lay tower was accomplished at Atlantic Marine in April or May 2001. The vessel was designed and intended to be used solely for the purpose of laying pipe in deep water, a purpose that could not be accomplished until the J–Lay tower was installed and operational. Just as "[a] schooner without sails is not properly equipped to engage in commerce," *American Shipbuilding & Dock Corp. v. John Rourke & Sons,* 4 F.2d 845, 845 (5th Cir.1925), a deep-water pipe-laying vessel without a J–Lay tower is not properly equipped to engage in its intended function. Each of the plaintiffs' contracts was entered before the J–Lay tower was installed, that is, before the vessel was "completed." Accordingly, the plaintiffs' contracts cannot be deemed maritime in nature, and admiralty jurisdiction over this matter is lacking.

The plaintiffs offer a number of objections to this conclusion, none of which can survive serious examination. First, they argue that the *FRANCIS MCDONALD* rule does not apply because Saibos's contracts with AmClyde, and hence the plaintiffs' contracts with AmClyde, were not contracts for the construction of a vessel. Second, they propose a watered-down version of the *FRANCIS MCDONALD's* "completed" requirement. Third, they attempt to eliminate the "completed" requirement entirely, focusing only on the

"launch" date, which they attempt to push back in time. Fourth, they attempt to eliminate the "launch" requirement as well, substituting a "delivery" test. Fifth, they argue that a finding of no admiralty jurisdiction in this case may lead to unfair and illogical results in other cases.

■ With respect to the argument that only Saibos's contract with Samsung was a contract for the construction of a vessel, "the settled rule is that a contract for the complete construction of a ship *or supplying materials therefor* is non-maritime and not within the admiralty jurisdiction." *Thames Towboat v. The Schooner FRANCIS MCDONALD*, 254 U.S. at 243, 41 S.Ct. 65 (emphasis added). Because it is uncontroverted that the J–Lay tower was intended to be delivered to Samsung's shipyard for incorporation into the vessel, the contracts of Hyundai and Patrick fall squarely within this rule. CSOne's contract, which called for CSOne to furnish labor in constructing the vessel, also falls within this rule.

With respect to the "completed" requirement, the plaintiffs argue that the degree of completion of the SAIBOS exceeded that of vessels at issue in cases holding that admiralty jurisdiction was lacking.[3] Thus, for example, the FRANCIS MC-DONALD was "manifestly incomplete" and "not in any condition to carry on any service." 254 U.S. at 243, 41 S.Ct. 65. The question, however, is not how far short the facts of other cases fell of reaching the standard raised by the Supreme Court, but whether the facts of this case meet that demanding threshold. The plaintiffs have identified no case even suggesting, much less holding, that the *FRANCIS MCDONALD* Court did not mean exactly what it said when it required

the vessel to be "sufficiently advanced to discharge the functions for which intended."

On the contrary, cases and distinguished authorities alike have continued to phrase the test precisely as the Supreme Court framed it 81 years ago. *See, e.g., The Boat LA SAMBRA v. Lewis*, 321 F.2d 29, 31 (9th Cir.1963); *MacDougall's Cape Cod Marine Service, Inc. v. One Christina 40 Foot Vessel*, 721 F.Supp. 374, 376 (D.Mass. 1989), *aff'd*, 900 F.2d 408 (1st Cir.1990); 1 S. Friedell, *Benedict on Admiralty* Section 186 (7th rev. ed.2000). More to the point, the Eleventh Circuit has confirmed that a vessel is not "completed" until it is placed "in the 'condition to function as intended.'" *Hatteras of Lauderdale v. GEMINI LADY*, 853 F.2d at 851 (quoting *The Schooner FRANCIS MCDONALD*, 254 U.S. at 245, 41 S.Ct. 65).

The facts of the reported cases illustrate just how seriously the courts follow the Supreme Court's admonition to restrict the range of maritime contracts to those entered before the vessel being worked on is "completed." For example, the GEMINI LADY was a new yacht, "completed" in the sense of satisfying the manufacturer's standards and obviously capable of undertaking many voyages on her own. However, the vessel did not yet include certain "customization" desired by the consumer/purchaser, including refinishing and re-mounting running lights and additional glass enclosures. 853 F.2d at 849. The Eleventh Circuit held the vessel was not "completed" for purposes of admiralty jurisdiction because, "[u]ntil the customization was completed [the purchaser] would not be satisfied as the [vessel] would not be in the 'condition to function as intended.'" *Id.* at 851 (quoting *The Schooner FRAN-*

---

**3.** The plaintiffs' assertion that Saibos "admitted" the vessel was completed, for purposes of establishing admiralty jurisdiction, by filing in the bankruptcy proceedings a motion describing the SAIBOS as "an oceangoing vessel whose primary purpose is deep sea pipe laying on the floor of international waters," merits no discussion.

*CIS MCDONALD*, 254 U.S. at 245, 41 S.Ct. 65). Nothing in either the appellate or district court opinion suggests the customization desired by the purchaser of the GEMINI LADY was even remotely as essential to the vessel's intended purpose as the J–Lay tower is essential to the purpose of the SAIBOS.[4]

The Ninth Circuit has been similarly rigorous. In *The Boat LA SAMBRA v. Lewis*, 321 F.2d 29 (9th Cir.1963), the Chris Craft vessels were "completed" as far as meeting the manufacturer's standards, but the consumer/purchaser desired additional electrical equipment—a ship-to-shore radio for one vessel and an automatic pilot for the other. The Ninth Circuit held that the articles' function "was to make the boats safer and more useful as pleasure crafts," such that the vessels were not "completed" without them. *Id.* at 31.[5]

Nor do the cases relied on by the plaintiffs reflect that the courts have lowered the bar for establishing vessel "completion." *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919 (11th Cir.2001), involved admiralty jurisdiction in tort, not contract, and the Court expressly distinguished *The Schooner FRANCIS MCDONALD* and *GEMINI LADY* on this

basis. *Id.* at 924. *The JACK–O–LANTERN* unremarkably held that a contract to convert a functioning car float into a place of amusement constituted a contract for repair. 258 U.S. at 96–98, 42 S.Ct. 243. Similarly, the barge in *American Shipbuilding & Dock Corp. v. John Rourke & Sons*, 4 F.2d 845 (5th Cir.1925), was a "completed barge," fully capable of performing its intended function as a concrete barge. *Id.* at 845. The loading and unloading apparatus made the subject of the disputed contract had not been necessary to allow the barge to perform as a concrete barge and were not contemplated by the owner until after construction was complete and the barge's function thereafter redesignated as a sugar barge. *Id.* Here, the SAIBOS has never had but one intended function—as a deep-water pipe-laying vessel—and the J–Lay tower has, from the inception of the project, been recognized as essential to the performance of that function.

Finally, *The MOUNTAINEER*, 286 F. 913 (9th Cir.1923), held only that a purse seine fishing vessel was "completed" before her owner contracted to purchase a purse seine net. *The MOUNTAINEER* probably could be satisfactorily distinguished based simply on the nature of the article at issue—a relatively short-lived

---

**4.** The plaintiffs' suggestion that *GEMINI LADY* is distinguishable because it concerned a contract for the sale of a vessel and not for the construction of a vessel is spurious; the Eleventh Circuit explicitly held that "neither contracts for construction nor for sale of a vessel are maritime in nature," 853 F.2d at 850, and it expressly invoked and applied the *FRANCIS MCDONALD* test.

**5.** The *LA SAMBRA* Court noted that the complaining contractor "was aware that the boats were new," *id.*, language repeated in similar forms in other cases. *See MacDougall's Cape Cod Marine Service v. One Christina 40 Foot Vessel*, 721 F.Supp. at 376; *Bill Fowler, Inc. v. Stadler*, 558 F.Supp. 1115, 1117–18 (S.D.Fla.1983). Patrick interprets this language as bestowing admiralty jurisdiction over what would otherwise be a non-maritime contract for original construction if the furnishing party is not aware the contract is for new construction. The threshold problem with Patrick's argument is that subject matter jurisdiction is not created by mistake. Nor did the *LA SAMBRA* opinion or any case citing it make the supplier's knowledge the sine qua non of its decision or articulate any reasoning consistent with Supreme Court precedent that would have allowed it do so. Finally, and dispositively, the Eleventh Circuit in *GEMINI LADY* made clear that it is the purchaser's intent, not the supplier's, that matters. *See* 853 F.2d at 851 ("[The purchaser's] intent was for this vessel to be customized [to] meet [the purchaser's] needs.").

piece of equipment, periodically replaced and only loosely appended to the vessel, versus a 2000–ton, multimillion dollar construction permanently made an "integral part" of the vessel. *The Boat LA SAMBRA*, 321 F.2d at 31. More fundamentally, however, the purse seine net in *The MOUNTAINEER* was not part of the original construction contract but was requested only after the vessel had sailed from Tacoma to Los Angeles County, after the shipbuilder's contract was fully accomplished. In this case, the J–Ray tower was an explicit, critical part of the original contracts for the SAIBOS's construction. As in *The COUNT DE LESSEPS*, 17 F. 460 (E.D.Pa.1883), "[a]ll the materials and work [dredging machinery furnished a scow after she was towed from New Jersey to Philadelphia for outfitting] were contemplated as necessary to complete the structure from the beginning, and the principal part of it was embraced in the original contract for construction." *Id.* at 461, *quoted in The Boat LA SAMBRA v. Lewis*, 321 F.2d at 31.

Just as there is no authority for diluting the "completed" requirement, there is no authority for jettisoning it entirely, leaving only a "launched" requirement. The plaintiffs' sole proposed authority for this one-legged test is *Tucker v. Alexandroff*, 183 U.S. 424, 22 S.Ct. 195, 46 L.Ed. 264 (1902), in which the Court stated that "[a] ship is born when she is launched." *Id.* at 438, 22 S.Ct. 195. This portion of *Tucker*, however, was explicitly distinguished by the *FRANCIS MCDONALD* Court as considering only the detention of a foreign seaman, with "no immediate concern with contracts for ship construction [and] no purpose to lay down any definite rule applicable to them." 254 U.S. at 244, 41 S.Ct. 65.[6]

■ The plaintiffs' arguments, especially those of Hyundai, appear to spring from a misapprehension as to the critical time for determining the maritime nature of a contract. For admiralty jurisdiction to attach, the contract must be maritime " 'at the time the contract goes into effect as a binding obligation.' " *Hatteras v. GEMINI LADY*, 853 F.2d at 850 (quoting *The MANHATTAN*, 46 F. 797, 799–800 (D.Wash.1891)). Thus, for a contract to work on a vessel to be maritime, the vessel must be "launched" and "completed" before the contract becomes a binding obligation. If the contract to work on a vessel is entered before the vessel is "launched" and "completed," the mere fact that goods and services are not provided pursuant to the contract until later cannot retroactively bestow maritime status on the contract. Thus, while Hyundai repeatedly stresses that it actually "furnished" the J–Lay tower components on January 26, 2001, its *contract* to furnish was entered in January 2000, almost a year before even the earliest events the plaintiffs (incorrectly) argue as showing the vessel was "completed."

CSOne and Patrick also focus fruitlessly on the dates they rendered services or provided materials. CSOne's contracts were entered on or about December 16 and 18, 2000, and Patrick's contract was entered sometime between late December 2000 and January 16, 2001. Because, as discussed above, the vessel was not "completed" until several months later (indeed, not until after the plaintiffs had rendered all services and provided all materials), these contracts cannot be maritime.[7]

6. In certain portions of their briefs, the plaintiffs assume the SAIBOS was "launched" on January 22, 2001, yet in other places they suggest she was "launched" during her November 2000 sea trials. Using the earlier date does not aid the plaintiffs, because the SAIBOS was not "completed" until the J–Lay tower was installed, long after their contracts were entered.

7. The plaintiffs apparently have seized on language from *MacDougall's Cape Cod Marine*

Unable to prevail under the Supreme Court's "completed and launched" test, the plaintiffs turn to argue that the critical issue is instead whether the vessel was "delivered" to Saibos before the plaintiffs' goods and services were provided. While the *LA SAMBRA* Court mentioned that the articles at issue "were installed when the boats were undelivered," 321 F.2d at 31, it did not ground its decision on this circumstance but merely noted it as an exclamation point underscoring its conclusion, reached pursuant to the "completed and launched" test, that the contract was not maritime. The plaintiffs have identified no authority, from the Eleventh Circuit or otherwise, for the proposition that "delivery" of an incomplete vessel somehow trumps the "completed and launched" test.

The plaintiffs next argue that a ruling against admiralty jurisdiction in this case will have devastating and absurd consequences in other cases. As a threshold matter, this Court's obligation is to follow clear Supreme Court and Eleventh Circuit precedent in deciding this case, not to critique that precedent in light of a hypothesized application of the law of unintended consequences. In any event, the Court does not share the plaintiffs' concern that the *FRANCIS MCDONALD* test may spawn illogical or unfair results in other cases.

As discussed previously, the *FRANCIS MCDONALD* rule is merely a "boundary point" to be heeded in distinguishing a

contract to construct a vessel from one to repair a vessel; "completion" is not a universal test of vessel status applicable in whatever context admiralty jurisdiction may be questioned. Thus, for example, a partially constructed casino boat may be a vessel for purposes of admiralty jurisdiction in tort even though it would not be a "completed" vessel for purposes of a breach of contract action by the builder. *See Bunge Corp. v. Freeport Marine Repair*, 240 F.3d at 923–25. Nor does the "launched and completed" test necessarily apply to any species of contract other than one to construct or repair a vessel. *See generally id.* at 925 n. 7 (noting at least 24 variant definitions of "vessel" and favoring the general, lax definition found at 1 U.S.C. Section 3 absent a more specifically applicable definition).

Finally, the plaintiffs argue that reasonable doubts should be resolved in favor of admiralty jurisdiction. *The JACK-O-LANTERN*, 258 U.S. at 99, 42 S.Ct. 243. Because no reasonable doubt exists in this case, this tiebreaker is inapplicable. The plaintiffs' ultimate appeal to equity is similarly unavailing, both because equity cannot create subject matter jurisdiction and because the equities have not been shown to favor the plaintiffs.[8]

"To maintain an action for wrongful arrest of a maritime vessel, the detainee must show that the arrest was not merely due to negligence, but that the action arose

noting that "the majority of the work was performed before the vessel was even launched." 721 F.Supp. at 376. This language—never adopted or even hinted at by the Eleventh Circuit—is at best surplusage, the result having been determined by the Court's conclusions that the contract was entered before the vessel was launched and that the work made the subject of the contract was necessary before the vessel could perform its intended purpose. *Id. B & B Salvage & Rig-*

*ging, Inc. v. M/V NORTH BEND*, 548 F.Supp. 123, 124 (E.D.Mo.1982), *aff'd*, 716 F.2d 908 (8th Cir.1983), on which the *MacDougall's* Court relied, is subject to the same analysis.

8. It is uncontroverted that Saibos has paid AmClyde in full for the work done by the plaintiffs, less a small sum paid directly to Patrick after AmClyde filed for bankruptcy. Thus, Saibos has not gotten "something for nothing."

from malice, bad faith, or reckless disregard of the other party's legal rights." *Coastal Barge Corp. v. The M/V MARITIME PROSPERITY,* 901 F.Supp. 325, 328 (M.D.Fla.1994); *accord Frontera Fruit Co. v. Dowling,* 91 F.2d 293, 297 (5th Cir.1937). Although, for the reasons stated, the plaintiffs' position cannot be upheld, neither is it so transparently meritless on the facts presented as to evince of itself the requisite level of impropriety. Saibos offers no supplemental evidence to support its claim of wrongful attachment and indeed devotes no argument to the issue. Whether or not Saibos has abandoned its claim, it has not shown it to be meritorious.

### CONCLUSION

For the reasons set forth above, Saibos's motions to dismiss the complaints, quash the warrant of arrest and release the vessel are **granted.** Saibos's motions for an award of attorneys' fees and costs are **denied.** Saibos is **ordered** to file, and to serve by telefax, no later than 2:00 p.m. Thursday, June 21, 2001, a proposed order it deems sufficient to accomplish a quashing of the warrant of arrest and a release of the vessel. The plaintiffs are **ordered** to file, and to serve by telefax, no later than 11:00 a.m. Friday, June 22, 2001, any objections to the proposed order.