# United States Court of Appeals
## For the First Circuit

---

Nos. 05-1173, 05-1174

DAVID E. MULLANE; JOAN-LESLIE MULLANE,

Plaintiffs, Appellants, Cross-Appellees,

v.

ADELE CHAMBERS; JEAN FARESE,

Defendants, Appellees, Cross-Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Thomas E. Clinton, with whom Robert E. Collins and Clinton & Muzyka, P.C. were on brief, for the appellants.
Paul L. Kenny, with whom Salim Rodriguez Tabit was on brief, for the appellees.

---

February 24, 2006

---

**LIPEZ**, **Circuit Judge**.  This is an appeal and cross appeal of the district court's resolution, on remand from this court, of competing claims to a 42-foot motorized yacht, known variously as the Lady B, the Lady B Gone, and the Cent'Anni (the vessel).  The vessel's owners, David and Joan Mullane, appeal the district court's rejection of their claim to a lien on the vessel.  Adele Chambers and Jean Farese, who seized the vessel to satisfy debts of the vessel's previous owner, appeal the district court's order that they reimburse the Mullanes for storing the vessel during the course of the litigation.  We affirm.

## I.

The facts have been recounted elsewhere.  This case has been tried twice, by two different district court judges, each of whom published an opinion.  Mullane v. Chambers, 349 F. Supp. 2d 190 (D. Mass. 2004); Mullane v. Chambers, 206 F. Supp. 2d 105 (D. Mass. 2002).  It has been the subject of a published opinion by this court.  Mullane v. Chambers, 333 F.3d 322 (1st Cir. 2003).  We review only the details relevant to the issues before us.  Because this case comes to us after a trial, we present the facts in the light most favorable to the district court's judgment.  See Wilson v. Mar. Overseas Corp., 150 F.3d 1, 3 (1st Cir. 1998).

In July 1998, the Mullanes bought the vessel from a trust established by Dr. David Murphy and his wife.  As consideration, the Mullanes paid $98,117 to Eastern Bank to discharge the

-2-

preferred ship's mortgage on the vessel in favor of the bank,[1] paid $2,000 cash to Murphy and assumed a $40,000 lien Murphy owed to his own company.

The vessel was federally documented and listed on the registry maintained by the United States Coast Guard.[2]  In the normal course of maritime affairs, transfer of the vessel and discharge of the mortgage should have been recorded immediately with the Coast Guard, in which case the public record would have shown that the Mullanes, not the Murphys, owned the vessel.  46 U.S.C. §§ 12101-12124, 31321.  For whatever reason, however, the sale and discharge were not recorded until September.  In the interim -- for all of August -- the public record showed erroneously that the Murphys owned the vessel, subject to a mortgage in favor of Eastern Bank.

At the time he sold the vessel to the Mullanes, David Murphy was indebted to Chambers and Farese, both of whom had loaned him money.  Chambers had obtained a $70,132 writ of execution

---

[1] A preferred ship's mortgage is a statutorily-created lien that can be publicly registered, see infra note 2, and can be enforced in an admiralty court.  See 46 U.S.C. § 31322 et seq.

[2] The Coast Guard maintains a "national form of registration" for vessels larger than five net tons. Vessels like the one involved in this case, larger than five net tons but not involved in any commercial enterprise, may be registered at the option of the owner.  See 46 U.S.C. § 12101 et seq.  See also National Vessel Documentation Center: Frequently Asked Questions, at http://www.uscg.mil/hq/g-m/vdoc/faq.htm (last visited Jan. 24, 2006).

-3-

against Murphy, and Farese a writ for $27,612. But neither Chambers nor Farese had attached any claim to the vessel until late August, when, acting on the information in the public record, they arranged for sheriff's deputies to seize the vessel.

Chambers and Farese learned about the transfer from the Murphys to the Mullanes and the mortgage discharge hours after the seizure. Nonetheless, they elected to press their claim to the vessel rather than attempt to satisfy Murphy's debt with property that actually belonged to him. Indeed -- according to their own statements -- upon learning that the Eastern Bank mortgage on the vessel had been discharged, Chambers and Farese abandoned their plans to seize Murphy's condominium, which they also had arranged for the sheriff's deputies to levy. They believed that the additional equity in the vessel available after the mortgage discharge would make any seizure of Murphy's own property unnecessary.

The Mullanes sued Farese, Chambers, and the Sheriff's Department that had seized the vessel. They claimed that the seizure had been illegal, that they were entitled to unencumbered ownership of the vessel, and that they were owed compensation for damage to the vessel that occurred during the seizure. The case landed on the admiralty docket of the district court. See Mullane, 333 F.3d at 328 (concluding admiralty jurisdiction correctly invoked). The Mullanes arranged for the vessel to be arrested, see

-4-

Fed. R. Civ. P. D, an action that prevented anyone from selling the vessel before litigation concluded. Initially, the vessel was held by the court. At some relatively early point, however, the Mullanes posted a $125,000 passbook savings account as security for the vessel, and it was released to their custody. See Fed. R. Civ. P. E(5)(d).

After the first trial in this case, the district court found that the Mullanes were bona-fide purchasers of the vessel who had no notice of Chambers and Farese's claims. The court also concluded that the seizure of the vessel was improper under Massachusetts law. The district court restored the Mullanes' ownership rights and ordered Chambers and Farese to pay $100,000 in punitive damages to the Mullanes, for what the district court termed their "wanton and reckless" disregard of the Mullanes' rights.[3]

We vacated and remanded, concluding that Chambers and Farese were entitled to rely on the public record unless they had actual notice of the transfer to the Mullanes, and that they had adhered to Massachusetts law in seizing the vessel. See Mullane, 333 F.3d at 329-33. We asked the district court to determine whether Chambers and Farese had knowledge of the Mullanes' claim to the vessel before they completed their seizure. We noted that if

---

[3] The district court found that no relief was warranted on the Mullanes' claims against the sheriff's department.

-5-

the district court found that Chambers and Farese had knowledge of the Mullanes' purchase, the court would need to determine whether there was any merit in Chambers and Farese's claim that the Murphys' sale of the vessel to the Mullanes constituted a fraudulent transfer under Massachusetts law. (The district court had resolved that question in the Mullanes' favor through application of federal law, which we concluded did not govern the transaction.)

On remand, the district court found that Chambers and Farese had no actual or constructive notice of the Mullanes' purchase at the time of the seizure (though they did within hours thereafter).[4] Consequently, the district court determined that Chambers and Farese had a valid claim on the vessel. The parties do not contest this determination on appeal. Because the district court found that Chambers and Farese had valid liens on the vessel, it did not need to reexamine the fraudulent transfer issue.

Recognizing that application of 46 U.S.C. § 31321, the vessel documentation statute, would yield a "harsh" penalty on the "innocent" Mullanes, the district court invited briefing on whether the Mullanes might be entitled to relief from that application, on admiralty or analogous state law grounds. The Mullanes suggested

---

[4] After our remand, the case was assigned to a different district court judge than the one who presided at the first trial. Due to that judge's busy schedule, the case was reassigned to the Chief Judge, who presided at the second trial and entered the judgment that we now review.

only that they were entitled to a maritime lien on the vessel, equal in value to the Eastern Bank mortgage that they had discharged.  The district court determined that no such maritime lien existed.

Finally, the court ordered, "in the interest of equity," that Chambers and Farese "reimburse the Mullanes for all reasonable storage and insurance costs of the vessel incurred since the levy." The Mullanes had incurred such charges by storing the vessel at various marinas during the course of the litigation as they tried to clear title to the vessel.

**II.**

## A.  The Mullanes' Appeal

At the conclusion of the second trial in this case, the district court opined that relief might be possible on grounds that, in light of Chambers and Farese's seizure, the Mullanes' discharge of the Eastern Bank mortgage had unjustly enriched Murphy.  Seeking to resolve the issue, the district court gave very specific instructions:

> I . . . need to have briefed the issue of . . . the role that Dr. Mullane's discharge of the preferred ships mortgage plays here.  I'm not here talking about simple appeals to equity. . . . <u>I want to know everything there is to know</u> about this type of circumstance either under the federal recording statute, and if we can't find that <u>let's go to the common law of the several states which have recording statutes</u>.  When a creditor seeks to levy on encumbered assets of the debtor, the creditor takes those assets encumbered.  Here there

-7-

> appears no evidence but that Dr. Mullane was innocent . . ..  Dr. Mullane may be entitled to . . . the equivalent of a preferred ship's mortgage . . ..

Tr. Day 2, pp. 33-34 (emphasis added).

Whether or not an equitable subordination argument could have been made on these facts, it was not made before the district court or before us, and so is waived.  Cf. Maryland National Bank v. The Vessel Madam Chapel, 46 F.3d 895, 901 (9th Cir. 1995) (recognizing that equitable subordination is "available in admiralty to resolve priority disputes").  Instead, the Mullanes argued that they were entitled to a maritime lien on the vessel, which they argued had been created by their discharge of the Eastern Bank mortgage.[5]  The holder of a maritime lien can look to a vessel itself, in rem, to satisfy any resultant debt.  See generally 46 U.S.C. § 31301 et seq.; Fed. R. Civ. P. C(1)(a); 2-II Benedict on Admiralty (2004).  The Mullanes relied on 46 U.S.C.

---

[5] The Mullanes argue here, as they did in their motion for reconsideration before the district court, that they had asked not for a maritime lien but for an equitable lien.  But the Mullanes did not forward any theory of law pursuant to which an equitable lien could be granted.  While they included the term "equitable lien" in their post-trial motion, the Mullanes relied entirely on two maritime lien theories and asserted that Dr. Mullane was "the holder of a maritime lien."  Pltfs. Post Trial Brief at 11.  Perhaps the Mullanes mistakenly thought that their maritime lien theories could create equitable liens.  But see 2-III Benedict on Admiralty § 24 (2005) (suggesting consensus that maritime liens are "stricti jurris; they cannot be conferred on the theory of unjust enrichment or subrogation").  At most, however, the Mullanes made legal arguments spiked with exactly the kind of "simple appeals to equity" that the district court had asked them to avoid.

-8-

§ 31342(a), the statute that creates a lien in favor of "a person providing necessaries to a vessel on the order of the owner." See Lake Charles Stevedores, Inc. v. Professor Vladimir Popov, MV, 199 F.3d 220, 223-25 (5th Cir. 1999) (discussing generally maritime liens for necessaries).  The Mullanes also argued that they were entitled to a lien under the "rule of advances," a common-law principle that awards liens to certain persons who do not provide necessaries but do "satisfy an outstanding or future lien" on a vessel, typically by paying for necessaries that are provided by another party.  2-III Benedict on Admiralty § 34 (2004).  See also Wilkins v. Commercial Inv. Trust Corp., 153 F.3d 1273, 1276-78 (11th Cir. 1998) (discussing rule of advances).

Under § 31342(a), a person provides a "necessary" by furnishing "goods or services . . . necessary to the continued operation of the vessel," in a manner that "facilitates the flow of commerce."  Payne v. S.S. Tropic Breeze, 423 F.2d 236, 241 (1st Cir. 1970) (discussing predecessor statute to § 31342(a)).  Classically, "necessaries" are those things that allow a vessel to perform its ordinary functions, such as needed repairs to an engine or foodstuffs for a long voyage.  See Trinidad Foundry & Fabricating, Ltd. v. M/V KAS Camilla, 966 F.2d 613, 614 n.2 (11th Cir. 1992) ("Necessaries are the items that a prudent owner would provide to enable a ship to perform the functions for which she has been engaged").  See also Bradford Marine, Inc. v. M/V Sea Falcon,

-9-

64 F.3d 585, 589-90 (11th Cir. 1995) (discussing definition of necessaries and concluding that attorney's fees incurred in collecting repair charges did not qualify as a necessary).

The rule of advances, like the doctrine of necessaries, facilitates reimbursements of those who allow a vessel to perform its functions. The difference is that the rule of advances provides protection not to the person furnishing "necessaries," but rather to a third person who pays for the goods and services that would have given rise to a statutory maritime lien, on an assurance that the vessel will be responsible for the debt. <u>Wilkins</u>, 153 F.3d at 1276. <u>See</u> <u>also</u> <u>The Emily Souder</u>, 84 U.S. (17 Wall.) 666 (1873) (holding that company, which on request of American consulate provided funds for repairs to American steamer stranded in Brazil, had maritime lien on the steamer); <u>Universal Shipping Inc.</u> v. <u>Panamanian Flag Barge</u>, 563 F.2d 483 (1st Cir. 1976) (awarding maritime lien to third party that provided funds to allow a vessel operator's purchase of "supplies and other necessaries").

On appeal, the Mullanes do not quibble with the district court's conclusion that their discharge of the Eastern Bank mortgage did not constitute a "necessary" but seek relief only pursuant to the rule of advances. We see at least two basic barriers to the Mullanes' rule of advances theory, both also fatal to the Mullanes' § 31342(a) argument.

First, maritime liens, created pursuant to the rule of advances or any other theory, are intended to safeguard the interests of "strangers to the vessel," not vessel owners or those who can control the vessel's affairs. Sasportes v. M/V Sol de Copacabana, 581 F.2d 1204, 1208 (5th Cir. 1978). "Quite clearly, owners may not benefit by the advances rule." 2-III Benedict on Admiralty § 34. See also Medina v. Marvirazon Compania Naviera, S.A., 709 F.2d 124, 125 (1st Cir. 1983) (per curiam) (recognizing that owners are not entitled to maritime liens). This is because, as the district court recognized, maritime liens and the admiralty jurisdiction that comes with them are a way of making the provision of services to vessels as safe and predictable as the provision of services to land-based businesses. A creditor with a maritime lien, not unlike the holder of a materialman's lien, can seek payment even if the person she negotiated with has absconded. The overarching goal is keeping the channels of maritime commerce open -- by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation. See Payne, 423 F.2d at 240-41; see generally Benedict on Admiralty, supra. The Mullanes' discharge of Murphy's mortgage did not further these goals.

Second, even assuming that the Mullanes' purchase of the vessel effected a maritime lien by "advance," the Mullanes already

-11-

have received the appropriate compensation for that advance: ownership of the vessel. The Mullanes entered into a contract whereby they agreed to supply the funds to extinguish the Eastern Bank mortgage in exchange for the vessel. Nothing else was promised. The Mullanes' ownership rights were compromised not because the vessel's operator or owner failed to repay them for an advance, but because, after they had been repaid in full -- and after any maritime lien had been extinguished by satisfaction -- they neglected to protect their rights by documenting their purchase.

## B. Chambers and Farese's Appeal

The district court granted the Mullanes' motion for reimbursement for the cost of storing the vessel during litigation, an expense they documented to the district court. Chambers and Farese contend that the district court abused its discretion in so doing.

It is well established that admiralty courts may award storage charges on equitable grounds. See The Ponzan, 274 U.S. 117, 120-23 (1927) (recognizing authority of admiralty courts to award storage charges as flexible and equitable in nature); David Forsht Assoc., Inc v. Transamerica ICS, Inc., 821 F.2d 1556, 1560-61 (11th Cir. 1987) (recognizing that storage charges in admiralty are created through equity). See also Taino Lines, Inc. v. M/V Constance Pan Atl., 982 F.2d 20, 24 (1st Cir. 1992) (recognizing

that any reduction of an award of storage costs in admiralty is an equitable determination). The district court has wide discretion in determining whether equitable relief in admiralty cases is appropriate. Id. We will not, on appeal, weigh the equities anew. Rather, "if there is a sound reason for the decision of the [district court], it does not matter that there are also sound reasons for the opposite result." Boston & Maine Corp. v. First Nat. Bank of Boston, 618 F.2d 137, 141 (1st Cir. 1980). See also Certain Underwriters at Lloyds v. Kenco Marine Terminal, Inc., 81 F.3d 871, 872-73 (9th Cir. 1996) (reviewing award of storage expenses for abuse of discretion); Kingstate Oil v. M/V Green Star, 815 F.2d 918, 922 (3d Cir. 1987) (same).

Essentially, Chambers and Farese argue that it was an abuse of discretion for the court to award storage charges because the Mullanes, having posted a bond, could have enjoyed the use of the vessel during the litigation. However, there is no evidence that the Mullanes did employ the vessel while the case was pending. The record indicates that the vessel was damaged severely in the initial seizure, and that its usefulness since has been limited. In any case, we are not persuaded that the district court abused its discretion in allowing the motion for storage costs.

Storage costs were an inevitable consequence of the litigation that we have recounted. As we have discussed, vessels subject to ownership disputes ordinarily are held in the custody of

-13-

the court during litigation.  See Fed. R. Civ. P. E; 28 U.S.C. §
1921(a)(1)(E) (2000).  If the Mullanes had not posted security and
served as substitute custodians, the court would have been entitled
to reimbursement for its storage costs.  Id.  And the court's
custodia legis expenses would have created a right superior to
Chambers and Farese's lien.  See 46 U.S.C. § 31326(b)(1); 2-IV
Benedict on Admiralty § 51 (2005).  There is no indication on the
record that the storage costs incurred by the Mullanes were any
greater than those that would have been incurred by the court.  The
Mullanes had an interest in maintaining the damaged vessel (which
they intended to use personally).  Their expenditures to insure and
store the vessel during litigation benefitted all parties.  These
were good enough reasons for the district court to appoint them as
the vessel's custodians and to reimburse them for storage charges.
See David Forsht Assoc., 821 F.2d at 1561 (holding that where
multiple parties had claims to a vessel, the party that arrested
the vessel and served as substitute custodian should be entitled to
reimbursement from the others, because that party benefitted all
claimants by safeguarding the vessel during litigation, at a cost
lower than would have been assessed by the marshal).

Chambers and Farese also appear to argue that the
Mullanes should not be entitled to storage charges because they
initiated, but eventually lost, this lawsuit.  Again, we are
unpersuaded.  This was not a frivolous suit.  It was a close case

-14-

that required two district court trials, the first of which the Mullanes won.  The district court found that the Mullanes were "innocent" parties, who fought at length, if unsuccessfully, to prevent their own property from being seized by another person's creditors.  Their claim to the vessel was a plausible one.  In light of these facts, we discern no abuse of discretion in reimbursing their storage charges.[6]  See Taino Lines, 982 F.2d at 24 (no abuse of discretion in awarding custodia legis expenses where partially unsuccessful litigation "was neither frivolous nor undertaken in bad faith").

### III.

The district court's order is **<u>affirmed</u>** in all respects. The parties shall bear their own costs and fees.

<u>So ordered</u>.

---

[6] Chambers and Farese also argue that Dr. Mullane forfeited the right to storage charges because, they contend, he documented the vessel's home port as in New Hampshire, where he intended to move it, rather than in Massachusetts, where it was at the time of the seizure, to avoid paying state sales tax on it.  We will not entertain this contention.  Before it allowed the Mullanes' petition for storage charges, the district court gave Chambers and Farese an opportunity to submit written objections.  Chambers and Farese submitted a post-trial memorandum that did not include any reference to the sales tax issue.  Accordingly, they waived the opportunity to make the argument they now attempt.  See In re Weinstein, 164 F.3d 677, 685 (1st Cir. 1999).