David E. MULLANE and Joan–Leslie Mullane Plaintiffs

v.

Adele CHAMBERS In Personam, Jean Farese In Personam, Frank Cousins, Sheriff, In Personam Essex County Sheriff's Dept. In Personam and M/Y Cent'Anni, (O.N.967917) her engines, tackle, equipment, and furnishings, In Rem. Defendants

Civil Action No. 98–11797–REK.

United States District Court, D. Massachusetts.

June 6, 2002.

---

Thomas L. Muzyka, Clinton & Muzyka, Boston, MA, for David E. Mullane, Joan-Leslie Mullane.

Paul L. Kenny, Medford, MA, John F. Lakin, Andover, MA, Salim R. Tabit, Harvey & Tabit, Andover, MA, for Adele Chambers, Jean Farese.

Robert A. Ciampitti, Jr., Law Offices of Ronbert Ciampitti, Boston, MA, for Frank Cousins.

## Opinion and Order

KEETON, District Judge.

### I. Introduction

This case concerns a boat that has, at various times, borne the name "Lady B," "Lady B Gone," and "Cent' Anni." As any sailor will tell you, it is bad luck to change the name of a boat, an adage that is supported by the partnerships, alliances, marriages, and familial relationships that have been damaged or destroyed during the saga of the vessel now known as the Cent' Anni (or Centanni).

The evidence before me, although marred by gaps that the parties could have filled by calling the appropriate witnesses, is sufficient to make findings by a preponderance of the evidence. No party suggests that more than a preponderance is required, and because I am able to find the facts recited in this opinion by a preponderance of the evidence, I need not decide which party bore the burden of proof on the various issues before me.

### II. The Actors

An ordinary conflict has permutations of relationships and interrelationships. This conflict is certainly no exception, and is perhaps an exemplar of extreme and exceptional. To facilitate a better under-

standing of the facts, I must identify the parties, both those who are in fact parties in interest in this case, and those who are in fact interlopers.

*The Vessel:* By maritime tradition, vessels are female actors, and in this case the vessel is principal among the actors. The M/Y (Motorized Yacht) Lady B was built in Tustin, California by Californian Yachts, Inc., in 1988. It was first sold to Russo's Marine Mart, Inc., at a time not precisely identified by any evidence before me. On July 28, 1990, the vessel was sold by Russo's Marine Mart, Inc., to Dr. John J. Walsh, Jr. and Beatrice M. Walsh. Dr. Walsh named the vessel "Lady B." *See* Plaintiffs' Exhibit No. 2; Defendants' Exhibit No. 114. The name of the vessel was later changed to "Lady B Gone." *See id.* At some point after David Murphy acquired the vessel, he renamed it "Centanni."

The Centanni is 42 feet long and weighs approximately 42,000 pounds. It is a twin engine, straight-shaft-driven pleasure boat. (Transcript of Day 1, Docket No. 158, filed January 2, 2002, pp. 24, 114).

*David Mullane:* David Mullane, a plaintiff in this action, is a vascular surgeon who resides at 512 Broadway in Everett, Massachusetts. Dr. Mullane has an office in Everett, which he shared at various times with Dr. John J. Walsh.

*Joan Leslie Mullane:* Joan Leslie Mullane is David Mullane's wife and is the other plaintiff in this action.

*John J. Walsh:* John J. Walsh is also a physician in Everett, Massachusetts. He and his first wife, Beatrice M. Walsh, were first to hold private ownership of the Centanni. Dr. and Mrs. Walsh were eventually divorced, and Dr. Walsh later married Judee Chambers.

*Judee Chambers:* Judee Chambers is the daughter of Richard Chambers and defendant Adele Chambers and the granddaughter of defendant Jean Farese. She is also Alfred Farese, Jr.'s niece. She was married to Dr. Walsh until December 12, 1997. (Transcript of Day 3, Docket No. 160, filed January 2, 2002, p. 25).

*Adele Chambers:* Adele Chambers is one of the two *in personam* defendants in this action. She is the wife of Richard Chambers, the mother of Judee Chambers, and the daughter of Jean Farese, the other *in personam* defendant. She is the sister of Alfred Farese, Jr. She was, at one time, a personal friend to David and Angela Murphy. (Deposition of Angela Murphy, Exhibit No. 111, p. 32–33).

*David Murphy:* David M. Murphy is the owner of several trucking companies, including Suburban Transportation, Inc., and Stryker Transportation Co. It is undisputed that he owned the vessel before July 2, 1998. David Murphy was a friend to Adele Chambers and Jean Farese. (Murphy Deposition, p. 33). He was a client of Richard Chambers and Alfred Farese, Jr. (Day 1, pp. 69; Transcript of Day 2, Docket No 159, filed January 2, 2002, p. 40). He was also a friend and patient of both Dr. Walsh and Dr. Mullane. (Murphy Deposition, p. 16; Day 1, pp. 110–11). At the trial of this case, no party called David Murphy as a witness.

*Angela Murphy:* Angela Murphy is the wife of David Murphy. She was a friend of Adele Chambers and Jean Farese. (Murphy Deposition, p. 32–33). Angela Murphy did not testify at trial, although the parties submitted portions of her deposition as Defendants' Exhibit 111 in evidence.

*Jean Farese:* Jean Farese is the other *in personam* defendant in this action. She is the mother of Adele Chambers and Alfred Farese, Jr., and was a friend to

David and Angela Murphy. (Day 3, p. 15; Murphy Deposition, p. 32–33).

*Alfred Farese, Jr.:* Alfred Farese, Jr. is an attorney in Everett, Massachusetts. He was in a partnership with his father and Richard Chambers, his uncle. He is the nephew of Adele Chambers and the grandson of Jean Farese. He represented David Murphy at various times, and also represented Dr. Mullane in connection with the purchase of the vessel. He filed this action on behalf of Dr. Mullane (Complaint, Docket No. 1, filed on September 1, 1998), and withdrew three days later (Docket No. 13, filed September 4, 1998).

*Rob Scanlon:* Rob Scanlon is a Marine Surveyor who surveyed the vessel at least four times. (Day 3, p. 30). At the time of trial, he had known David Murphy for "about six years." (Day 3, p. 38). Mr. Scanlon also knew Dr. Walsh, and had seen the vessel at the time Dr. Walsh owned it. (Day 3, p. 39).

III. Decision as to What Law Applies and the Appropriate Legal Standard

All parties argue that this court is required to adhere to the law of Massachusetts in determining the outcome of this case, although they disagree about which provisions of that law apply. I need not resolve this dispute, however, because the parties are wrong as a matter of law to suggest that Massachusetts law governs the central issues of the case.

■ When they filed this civil action, plaintiffs invoked the admiralty jurisdiction of this court (Complaint, Docket No. 1, filed September 1, 1998, at ¶ 5; Amended Complaint, Docket No. 7, filed September 4, 1998, at ¶¶ 7 & 8). Although the defendants denied the jurisdictional statement in their answer (Answer, Docket No. 27, filed August 30, 1998, ¶¶ 7 & 8), they never filed any motion challenging the jurisdic-

tion of this court to adjudicate the controversy in admiralty.

The Constitution provides that the judicial power of the United States shall extend to "all Cases of admiralty and maritime Jurisdiction." U.S. CONST. art. III, § 2. Congress implemented this constitutional grant of subject matter jurisdiction in the Judiciary Act of 1789 by giving the district courts "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction ... saving-to-suitors, in all cases, the right of a common law remedy, where the common law is competent to give it ...." The statute conferring original admiralty jurisdiction on the federal district courts is 28 U.S.C. Section 1333. 14A CHARLES A. WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3671 (3d ed.1998) (footnotes omitted).

I find that the admiralty jurisdiction of this court was properly invoked and that the court has jurisdiction over this case *only* under its admiralty powers.

■ The substantive rules of admiralty and maritime law apply to a case when it falls within federal admiralty jurisdiction. *Clancy v. Mobil Oil Corp.,* 906 F.Supp. 42 (D.Mass.1995).

I have found no case in admiralty that defines when the purchase of a vessel was a good faith purchase. The cases cited by the plaintiffs, *Maryland National Bank v. Yacht Escape II,* 817 F.Supp. 1 (E.D.N.Y. 1993) and *Stewart & Co. v. Rivara,* 274 U.S. 614, 47 S.Ct. 718, 71 L.Ed. 1234 (1927), are not admiralty cases. The cases cited by the defendants similarly are inapposite.

Where the law is unsettled, the court must decide what standard it should apply. *See Fitzgerald v. United States Lines Co.,* 374 U.S. 16, 20, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) ("Congress has largely left to

this Court the responsibility for fashioning the controlling rules of admiralty law.").

At common law, a bona fide purchaser was one who paid value for goods without knowledge of another's claim to those goods. Although the Uniform Commercial Code is not controlling in this admiralty case, reference to it is helpful in defining the elements of a bona fide purchase with clarity. In Massachusetts, which has adopted the Uniform Commercial Code,

> A "bona fide purchaser" is defined ... as "a purchaser for value in good faith and without notice of any adverse claim." G.L.c. 106, § 8–302(1). Each of the terms contained in this definition is itself defined elsewhere in G.L.c. 106 as follows.

> > A "[p]urchase" is any voluntary transaction creating an interest in property, including (among others) a sale or issue.

> G.L.c. 106, § 1–201(32).

> .　　.　　.　　.　　.

> A person gives "[v]alue" for rights if he acquires them "in return for any consideration sufficient to support a simple contract." G.L.c. 106, § 1–201(44)(d). An exception exists for negotiable instruments, where a holder takes an instrument for value "to the extent that the agreed consideration has been performed" (emphasis added). G.L.c. 106, § 3–303(a). See New Bedford Inst. for Sav. v. Gildroy, 36 Mass.App.Ct. 647, 652, 634 N.E.2d 920 (1994) (bank's deposit of loan proceeds into company account in return for note constituted performance of consideration).

> "Good faith" means "honesty in fact in the conduct or transaction concerned." G.L. c. 106, § 1–201(19). Good faith is to be determined by a subjective standard: what is required to establish good faith is an honest conviction or belief as

to the legitimacy of the transaction, not the exercise of due care or the observance of reasonable commercial standards. See Dion v. Silver City Dodge, Inc., 398 Mass. 58, 60, 495 N.E.2d 274 (1986); Industrial Nat'l Bank v. Leo's Used Car Exch., Inc., 362 Mass. 797, 801–802, 291 N.E.2d 603 (1973) New Bedford Inst. for Sav., supra at 652, 634 N.E.2d 920.

"A person has 'notice' of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know." G.L.c. 106, § 1–201(25). Accordingly, notice is determined by a standard that is objective in part, because actual knowledge of certain facts and circumstances may provide reason to know of another fact. In the case of investments, mere notice that one is dealing with a fiduciary does not create a duty of inquiry, but knowledge that the transaction is for the benefit of the fiduciary, or otherwise is a breach of duty, does charge the purchaser with notice of an adverse claim. G.L.c. 106, § 8–304(3). See Michelin Tires (Canada) Ltd. v. First Nat'l Bank, 666 F.2d 673, 682 (1st Cir.1981) (under Massachusetts law, person has notice of fact when, from all the information at his disposal, he has reason to know of it); Higgins v. Shenango Pottery Co., 256 F.2d 504, 510 (3d Cir.1958) (under Pennsylvania law, where corporate directors diverted opportunity to partnership, other partners had knowledge of fiduciary relation, and extraordinary circumstances imposed compelling duty of inquiry). The fact

that property has been obtained for a payment substantially less than the property's real value may in itself give reason to know of some wrongdoing, and thereby establish notice of an adverse claim. *See Kanall v. 318 Lounge, Inc.,* 1 Mass.App.Ct. 5, 8, 294 N.E.2d 429 (1972); Restatement (Second) of Trusts, supra at § 297 & comment i, at 78, § 298; 4 Scott, Trusts, supra at § 298.4. "Adverse claim" is defined as "a claim that a transfer was or would be unauthorized or wrongful or that a particular adverse person is the owner of or has an interest in the security." G.L. c. 106, § 8–302(2).

*DeMoulas v. Demoulas Supermarkets, Inc.,* 424 Mass. 501, 546–49, 677 N.E.2d 159, 190–91 (1997).

## IV. Decision Regarding Bona Fide Purchase

### A. *Summary of Facts*

Dr. Mullane and David Murphy worked on the vessel together from the time Murphy acquired it in late 1997, through the spring of 1998. (Day 1, pp. 110–12, 120). At some point during the spring of 1998, Dr. Mullane and Mr. Murphy had one or more conversations about the possibility that Dr. Mullane would purchase the vessel. (Day 1, pp. 128–29). By June of 1998, these conversations blossomed into negotiations, and soon thereafter the parties reached an agreement for Dr. Mullane to purchase the vessel. (Day 1, p. 27).

On or about July 2, 1998, Dr. Mullane purchased the vessel by (1) paying the balance of a First Preferred Ship Mortgage for $98,117.03 to Eastern Bank (Exhibit 3), (2) delivering a personal check to David Murphy for $2,000.00 (Exhibit 6), and (3) assuming responsibility for a lein on the vessel held by Stryker Corporation in the amount of $40,000.00. (Day 1, pp. 45–46).

I find by a preponderance of the evidence that the timing of these three transactions was as I have stated above. I find also, however, that these three transactions were part of a unified whole, and the specific order in which they occurred is immaterial. The total amount Dr. Mullane paid for the vessel was $140,177.03.

On August 28, 1998, deputies from the Essex County Sheriff's Department seized the vessel at the Seaport Marina in Lynn, Massachusetts. (Day 2, p. 74). David and Angela Murphy were both aboard the vessel at the time it was seized. (Day 2, pp. 75–77).

After the seizure, the Sheriff's Department moved the vessel, or had it moved, to Newburyport.

On September 1, 1998, the plaintiffs initiated this civil action by filing a complaint and a Motion for a Temporary Restraining Order. (Docket No. 1). On October 23, 1998, plaintiffs filed notice with the court that they had deposited $125,000.00 as security for the vessel in a savings account a the Everett Co-operative Bank. (Docket No. 41). That same day, the court ordered that "the Everett Co-operative Bank not release the funds until further order from this court," (Docket No. 42), and a warrant to deliver the vessel was issued to the defendants.

### B. *Sufficiency of Consideration*

■ Defendants assert that the amount paid by Dr. Mullane was so far below the value of the vessel as to establish notice of an adverse claim. In support of that assertion, defendants offered the testimony of Rob Scanlon, an experienced Marine Surveyor.

Scanlon appraised the vessel for Forward Financial on September 15, 1997. On direct examination by counsel for the

defendants, he testified as follows regarding that appraisal:

Q. Okay. And where did you go to do that survey or appraisal?

A. The survey was conducted at Stryker Trucking Company, Chelsea, Massachusetts.

. . . . .

Q. Okay. Now, what did you do in 1997 for the bank in relation to that appraisal? I mean, what did that appraisal consist of?

A. Okay, the bank did not want me to fire up the engines or compression check or run the engines or test any of the wiring systems. They wanted me to go through the boat, visually look at the boat, inventory any equipment, and put a value on the boat reflecting its condition.

. . . . .

Q. And did you put a value on the vessel at that time?

MR CLINTON: Objection, your Honor. They have never listed him as an expert to render opinions on value.

THE COURT: Well, I overrule that objection. I will take the evidence for the purpose of showing what was the value that he placed on it at that time and for the purpose and with the limitations that he has indicated that were given to him about not firing up the engine. So of course the value is not going to be representative of what the value would have been if further inquiries had been done.

. . . . .

A. The value I placed on it at the bottom of Page 1 is $85,900 based on the condition of the vessel when I saw it that day.

(Day 3, p. 32–33). Mr. Scanlon's survey report of September 5, 1997 was received into evidence as Defendants' Exhibit 109.

Mr. Scanlon testified as to an additional appraisal:

Q. And do you remember when you appraised it?

A. Uhm, I think it was when I was contacted by Dr. Mullane to do a prepurchase survey.

Q. Okay. And do you remember where—did you in fact go and do a survey of the vessel?

A. Yes I did.

Q. Do you remember where the vessel was when you did that survey?

A. It was in Admiral's Hill in Chelsea.

Q. And was there anyone present when you did that survey?

A. Dr. Mullane.

(Day 3, p. 34). Defense counsel then showed Mr. Scanlon what was later received into evidence as Defendants' Exhibit 110. The examination continued as follows:

A. This is a prepurchase condition and valuation survey that is done for a client purchasing a boat.

Q. And who contacted you to do that survey?

A. Dr. David Mullane.

Q. And when did he contact you to do that survey?

A. It would have been within the week previous, or even days previous.

Q. Could you give me the date again sir? I'm sorry.

A. Okay, the date of my survey, survey report number Mullane–98.6.15. That means in 1998, June 15, I did the survey on this yacht.

Q. And can you tell the Court what it is you did to produce your survey?

A. The doctor had retained me to do a full prepurchase condition and valuation survey, which was not only testing the hull, all the AC and DC wiring systems, refrigeration, but also to do an analysis and compression testing of her engines and generator and conduct a sea trial. On the date of the survey, sea trials and engine analysis were not done. That was going to be done later when the vessel was launched.

Q. And did you ever have an opportunity to do that?

A. No.

. . . . .

Q. And as a result of that survey, did you put a value on the vessel?

A. I did.

Q. And what was that value?

MR. CLINTON: Just note my objection, your Honor.

THE COURT: The objection is noted and overruled.

. . . . .

A. $305,000 as a present value. Replacement cost $489,900.

(Day 3, p. 35–36).

Mr. Scanlon later testified that the $305,000 figure represented "the value an insurance company could insure that vessel for in the condition" it was in when examined. (Day 3, p. 43).

At that time, the court questioned the usefulness of that testimony to any issue before the court:

THE COURT: ... How could I use that? The amount for which you could insure it is not necessarily its value right now. . . .

(Day 3, p. 43). That view of the issue remains unchanged. I consider this evidence of valuation here not for the purpose of establishing what the true value of the vessel was at the time of the purchase, but as one factor in determining whether the amount paid by Dr. Mullane was so far out of the bounds of reason in relation to the true value as to give rise to notice of an adverse claim. I also credit the testimony of Dr. Mullane regarding the research he did before purchasing the vessel:

Q. And in order to buy that vessel, did you do anything to look into its background and value?

A. As I became more interested in purchasing it, I checked the blue book value of the boat. I believe I saw one survey on the boat. I kind of shopped around and looked at other boats of similar size and different manufacturer and kind of roughly got an idea of what equivalent boats were like and worth.

(Day 1, pp. 26–27).

Dr. Mullane also testified regarding the terms of the contract for the purchase:

A. [David Murphy] told me that the boat had cost him a residual to Eastern Bank, which at the time of the sale was down to $98,177, and that his company had a $40,000 lein against that boat for moneys that they had put in to transport it and otherwise. So that his total costs in that boat or his investment in that boat was $140,000.

(Day 1, pp. 45–46).

The court received no admissible evidence that would permit a finding as to the specific fair market value of the vessel at the time of its purchase. Such a finding is unnecessary in this case, however, because I find that, whatever the fair market value, in the circumstances of this transaction, the amount paid, $140,177.03, constitutes valuable consideration and was not so low as to put Dr. Mullane on notice of an adverse claim to the vessel.

### V. More About Plaintiffs' Lack of Notice of a Claim

#### A. The Claims

At some point before 1996, Adele Cambers loaned approximately $50,000 to David Murphy, Angela Murphy, Suburban Transportation Company, Suburban Transportation, Inc., and Suburban Contract Carriers, Inc., or to some combination of these people and entities. (Murphy Deposition, pp. 31–33). Around the same time, Jean Farese loaned a sum of money to these same people or entities. (Murphy Deposition, p. 34). At the time the loans were made, the Murphys, Adele Chambers, and Jean Farese were friends. (Murphy Deposition, p. 33).

On November 1, 1996, Jean Farese obtained a Writ of Execution on Money Judgment in the amount of $27,612.00 against David Murphy in Malden District Court. (Plaintiffs' Exhibit 9).

On April 22, 1998, Adele Chambers obtained a Writ of Execution in the amount of $70,123.32 against David Murphy, Angela Murphy, Suburban Truck Packers, Inc., Suburban Transportation Company, Inc., Suburban Transportation, Inc., and Suburban Contract Carriers, Inc. in Suffolk Superior Court. (Plaintiffs' Exhibit 8).

#### B. Alleged Notice to Dr. Mullane

■ Before this civil action commenced, Adele Chambers and Dr. Mullane met on two occasions. (Day 3, p. 6). The first meeting took place at the wedding of Adele Chambers's daughter, Judee, to Dr. Walsh. It is unclear whether Adele Chambers and Dr. Mullane actually spoke at that event. (Day 3, pp. 10–11).

Adele Chambers described the second meeting in the following way:

Q. (by Mr. Kenny) And could you tell me where you met him?

A. I met him at an office in Everett that he shares with his partner at that time, Dr. Walsh.

. . . . .

Q. What was the date that you went to Dr. Walsh's office, as best you can remember?

A. The baby was three months old, so ... I believe it was September 1996? '95 or '96.

. . . . .

Q. And when you went there, did you meet Dr. Mullane again?

A. Yes.

Q. And can you tell me what the circumstances were under which you met Dr. Mullane?

A. Yes. I was in an upstairs office with Dr. Walsh, my daughter, and the baby, and we were chatting. And all of a sudden Dr. Mullane walked——he had a folder in his hand, and he walked into the office unannounced, and he was very agitated. He addressed himself to Dr. Walsh, and he said—I'm sorry, I'm nervous—he said, "Do you have a hammer or an ax?" And Dr. Walsh-

. . . . .

Dr. Walsh laughed and said, "What do you need a hammer for?" And Dr. Mullane said that "Why did you send David Murphy to me? He has a severe case of diabetes. He doesn't listen to anything I tell him. If he doesn't listen, he's going to die."

. . . . .

Dr. Walsh laughed, and he said, "Ask Adele what she thinks of David Murphy." And I answered, "David Murphy

owes me $50,000 and he still hasn't paid me."

(Day 3, pp. 7–8).

Judee Chambers Walsh testified to substantially the same conversation. (Day 3, pp. 19–21).

Dr. Mullane testified that he never discussed David Murphy with Mrs. Chambers. (Day 2, p. 10).

I conclude that the conversation between Adele Chambers, Dr. Walsh, and Dr. Mullane occurred in 1996, as reported by Adele Chambers and her daughter. I find by a preponderance of the evidence that this brief conversation, which took place at least a year before David Murphy acquired the vessel in 1998, did not provide Dr. Mullane with notice that any claim against David Murphy was pending in 1998. And, even if Dr. Mullane had known of such a claim, no evidence is before the court that the vessel was ever properly attached for purposes of satisfying the judgments against David Murphy, as I explain more fully below in Part VII, or that Dr. Mullane knew or by the exercise of reasonable care would have known of the existence of those judgments.

### C. Imputation of Attorney's Knowledge

As an additional theory, defendants assert that the knowledge of Dr. Mullane's attorney ought to be imputed to him. Alfred Farese, Jr. is Adele Chambers's brother-in-law and Jean Farese's son. He was a law partner with Richard Chambers until 1995. Richard Chambers represented David Murphy while Mr. Chambers was in practice with Mr. Farese and his father. Mr. Farese later represented both David Murphy and Dr. Mullane.

█ All parties to the transactions at issue in this case, and to the other related transactions, were fully advised of the issues concerning Mr. Farese's representation, and were aware of and consented to joint or concurrent representation. No party is entitled to take advantage of these representation arrangements. It would not be appropriate, in these circumstances, to impute to Dr. Mullane Alfred Farese's knowledge, even if direct evidence of that knowledge had ever been presented to the court.

### VI. Defendants Alternative Claims

I hold that an alleged intent of Angela and David Murphy to defraud the defendants, even if such an intent could be inferred in this case, would not deprive Dr. Mullane of the benefit of bona fide purchaser status under the admiralty and maritime law applicable to this case. This holding is supported by the reasoning stated below, to which I turn after noting that, as a bona fide purchaser, Dr. Mullane is entitled to a declaratory judgment that he is the true owner of the vessel.

█ Defendants appear to claim, at least as an alternative, that David and Angela Murphy were not the true owners of the vessel when it was sold. Rather, they say, the Murphys held the vessel in trust for the benefit of Angela Murphy's nieces and nephews. The limited evidence placed before the court at trial regarding the trust does not establish that the trust was the true owner of the vessel. Moreover, David and Angela Murphy were vested with the indicia of ownership, and behaved as the true owners of the vessel. Even at common law, a bona fide purchaser from one who is vested with the indicia of ownership is entitled to the same protections as a purchaser from the true owner. *See, e.g., Jerome v. Eastern Finance Corp.,* 317 Mass. 364, 369, 58 N.E.2d 122, 125 (Mass.1944).

█ Defendants also claim, as an alternative, that the purchase of the vessel

should be declared void as an illegal transaction. Dr. Mullane admitted at trial that after he purchased the vessel, he documented its home port as Seabrook, New Hampshire "to avoid two months of taxes in Massachusetts." (Day 1, p. 163–64). Dr. Mullane's actions after the purchase do not have any legal effect on his status as a bona fide purchaser. Stated more clearly, the mere fact that Dr. Mullane sought to avoid taxes, whatever the other implications of that attempt might be, does not entitle the defendants or this court to undo a lawful transaction that had already been completed and that was entirely distinct from Dr. Mullane's later actions.

## VII. Issues Relating to the Actions of the Essex County Sheriff's Department

On June 21, 2000, this court issued an Interlocutory Order, allowing in part the motion of the Essex County Sheriff and Essex County Sheriff's Department (Docket No. 118). At that time, the court noted:

> With regard to [the issue of whether the Sheriff's Department acted improperly when it seized the vessel], the Sheriff's Department has proffered evidence that is undisputed that it acted properly in relation to protection against harm to the vessel throughout the seizure, custody, and release of the vessel. *See* Docket No. 106, Exh. 7 at pp. 63–66, 69–91 (Deposition of Deputy Gilbert Medeiros); *See id.,* Exh. 9 at pp. 37–40, 44–49 (Deposition of Chief David Wentzell). The plaintiffs, in response, have not proffered evidence to support a finding (a) that the damage to the boat was sustained while in the custody of the Sheriff's department, which was from August 28, 1998 until September 4, 1998 or (b) that the Sheriff's Department acted improperly in relation to protecting the boat from damage while it was under its care. (For date of release of vessel to the plaintiffs from the Sheriff's Department, see Docket No. 39. For date of release of vessel from the Sheriff's Department to the U.S. Marshall, see Warrant to Deliver, dated October 10/23/98, on Docket after Docket No. 42.) Because plaintiffs have failed to proffer evidence sufficient to support a finding that the Sheriff's Department violated its legally defined duty to protect the vessel from harm and caused the damage to the vessel that plaintiffs allege occurred while in the Sheriff's custody, I conclude that the Sheriff's Department's motion for summary judgment has merit.

Plaintiffs argue also that, despite their inadequate proffer, the court should deny the motion for summary judgment on the ground that plaintiffs should have the benefit of the principle of *res ipsa loquitur.* This argument cannot be developed to their advantage on this record, however. The circumstances of this case in admiralty are not within the scope of precedents on *res ipsa loquitur,* and no reason appears for a court's extending the "principle" to circumstances to which case law would not apply it.

Docket No. 118 at 12.

In the same Memorandum and Order, I allowed the Sheriff's Department's motion to bar plaintiffs' claims for damages to the vessel's mechanical, electrical, and plumbing systems, in part because I determined that the plaintiffs had acted improperly in conducting discovery. *Id.* at 18.

The rulings I made on June 21, 2000 did not dispose of all claims relating to the Sheriff's department. Section 44 of chapter 223 of the Massachusetts General Laws provides:

> No ship or vessel shall be attached in a civil action unless the plaintiff or a person on his behalf makes affidavit and

proves to the satisfaction of a justice of a court that he has a good claim and reasonable expectation of recovering an amount, exclusive of all costs, equal at least to one-third of the amount of damages claimed, which affidavit shall be annexed to the writ of attachment, and the certificate of the justice that he is satisfied that the same is true shall be annexed to the writ of attachment or endorsed thereon.

Mass. Gen. Laws. ch. 223, § 44.

■ Assistant Deputy Superintendent with the Essex County Sheriff's Department Gilbert Medeiros testified that when he and his team seized the vessel, they were acting under the authority of the executions themselves. (Day 2, p. 92). No order or affidavit was attached to the execution, nor was any writ of attachment filed with this court. *Id.*

Without regard to the care taken by the Sheriffs's department when the vessel was seized, I find that the seizure itself was contrary to state law, under which the Sheriff's department purported to be acting. The Sheriff's department had no authority to seize the vessel without first complying with the requirements of Section 44.

A question remained at the outset of the trial regarding whether the deputies themselves remained or were ever parties to this suit. (Day 1, pp. 16–18). The Complaint and Amended Complaint (Docket Nos. 1 and 9) name Frank Cousins, Essex County Sheriff, and the Essex County Sheriff's Department. Individual deputies were not named, and service upon them is not evidenced in the docket in this civil action. I conclude, therefore, that they are not proper defendants in this suit.

■ I also conclude that the Sheriff's Department and the Sheriff acting in their official capacities within that department are immune from damages in the circumstances of this case, even if plaintiffs had met their burden of proving the specific monetary value of the damage that occurred (see Part VIII below).

For these reasons, the Order below awards no damages against the named defendants Frank Cousins, Sheriff, or the Essex County Sheriff's Department.

## VIII. Damages and Costs

### A. Compensatory Damages

Plaintiffs demonstrated at trial that the vessel was damaged as a result of the seizure and that items were removed from the vessel. They did so through the credible testimony of Dr. Mullane to the following effect:

Q. All right, now, had you been on the vessel while it was under way prior to its seizure?

A. Yes.

Q. Okay. After it was released from the seizure and you were on the vessel when it moved those three occasions, what did you observe or experience on the vessel as to its operations?

. . . . .

Q. What observations did you make about the operation of the vessel while you were on it while it was under way?

A. It had an extreme vibration in it on the way back from Newburyport to Lynn.

Q. Did you experience that vibration before?

A. No, I did not.

Q. And has that vibration ever been repaired?

A. Yes, it has.

Q. And did you pay for the repairs?

A. I did.

. . . . .

Q. And how much did you pay for the repairs?

A. It was approximately—it was about $3,000 paid, and I supplied a drive shaft that I already had in my possession to replace it with.

Q. What was the $3,000 for?

A. That was for labor to make the repairs.

Q. Okay. And where did you get the drive shaft?

A. The boat had an extra drive shaft with it when I purchased it.

. . . . .

Q. And what value did you put on that drive shaft?

A. That would be a guess.

. . . . .

Q. From the time the vessel was returned after the initial seizure by the Essex County Sheriff up until the time the vessel was put into dry dock in Danversport Yacht Club, did you make any observations of anything different on the vessel that you didn't observe prior to the seizure?

A. There was a significant number of damaged areas to the boat that were visible.

. . . . .

Q. What observations did you make?

A. The bow rail was severely bent and damaged.... There was a very expensive life raft which was missing off the front deck. The transom door would no longer close. The transom fairing was all cracked ... There was a tremendous amount of cosmetic involvement. The carpets were all soiled. The refrigerator was putrid. There were scuff marks and scratches all over the cockpit area.... The propellers were nicked... There was significant equipment missing from the boat, fishing rods, electrical

wires, 50–amp wires. There was a broken air conditioner. There was a broken pump to the live bait well. The railings, scuff railings along the back part of the hull were all dented and the paint was scratched up. And a lot of the provisions on the boat were missing....

(Day 1, pp. 53–59).

Mr. Scanlon testified regarding the damage in the following way:

Q. And when you saw it the last time, what damage did you observe to it? From the time that you saw it at Admiral Hill to the time you saw it after Admiral Hill, you observed damage to it?

A. At Newburyport? Extensive.

Q. Is that where you saw it?

A. When I was retained by Dr. Mullane's counsel to go up to Newburyport, I saw a lot of damage to it.

Q. What's the damage you saw?

A. It is defined in my report.

(Day 3, p. 55).

That report was received into evidence as Plaintiff's Exhibit 11. The six-page report recounts substantial physical damage and missing items. It does not provide an estimate of the total monetary value of the damage.

 Plaintiffs did not put forth sufficient evidence regarding the specific extent and monetary value of the damage to allow a finding as to that issue. Because plaintiffs failed to meet their burden of proving an amount that the court could properly award as damages, the court awards no damages.

## B. Exemplary and Punitive Damages

Plaintiffs's complaint does not expressly seek exemplary or multiple damages, and it is unclear whether multiple damages are available in admiralty. It is unnecessary

to resolve this question, since plaintiffs have not met their burden of proving an amount that could properly be awarded as damages to be multiplied.

The United States Court of Appeals for the First Circuit has repeatedly held that punitive damages are available at admiralty "where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard of the rights of others." *CEH, Inc. v. F/V Seafarer*, 70 F.3d, 694, 699 (1st Cir.1995) (collecting cases). I find that defendants' conduct in this case constituted an intentional and conscious disregard for the rights of plaintiffs. When the defendants had the vessel seized they were either aware, or soon became aware, that David Mullane had sold his ownership interest in the vessel to Dr. Mullane. They nevertheless continued to assert a right to the vessel in satisfaction of David Murphy's debt, and by that course of action deprived Dr. Mullane of his rights with respect to possession and use of the vessel.

█ Because the defendants intentionally and consciously disregarded the rights of plaintiffs, the Order below awards punitive damages to the plaintiffs in the amount of $100,000.00.

## C. Costs

Costs are awarded to plaintiffs.

### ORDER

For the reasons explained above, it is ORDERED:

(1) Motion by Frank Cousins for final judgment as to less than all the parties (Docket No. 153) is DISMISSED as Moot;

(2) The clerk is directed to enter forthwith, on a separate document, a Final Judgment as follows:

For the reasons explained in the Opinion and Order of June 6, 2002, it is ORDERED,

Plaintiffs are hereby declared and adjudged to be the true owners of the Motorized Yacht Cent'Anni.

Judgment for the plaintiffs in the amount of $100,000.00, plus costs.

(3) The clerk is directed to release to the plaintiffs the passbook deposited with this court on October 23, 1998 (Docket No. 43) and to enter forthwith, on another separate document, an Order as follows:

The Everett Co-operative Bank is hereby ordered to release the funds deposited in Passbook Account No. 00031560, plus any interest that has accrued in that account, to David E. and Joan–Leslie Mullane.

### Final Judgment

For the reasons explained in the Opinion and Order of June 6, 2002, it is ORDERED,

Plaintiffs are hereby declared and adjudged to be the true owners of the Motorized Yacht Cent'Anni.

Judgment for the plaintiffs in the amount of $100,000.00, plus costs.

### Order

The Everett Co-operative Bank is hereby ordered to release the funds deposited in Passbook Account No. 00031560, plus any interest that has accrued in that account, to David E. and Joan–Leslie Mullane.