David E. MULLANE and Joan–Leslie Mullane, Plaintiffs,

v.

Adele CHAMBERS, In Personam, Jean Farese, In Personam, Frank Cousins, In Personam, and Essex County Sheriff's Dept., In Personam, and M/V Cent'Anni (O.N.967917) her engines, tackle, equipment, furnishings, In Rem, Defendants.

No. CIV.A.98–11797–WGY.

United States District Court,
D. Massachusetts.

Dec. 22, 2004.

---

Robert A. Ciampitti, Jr., Law Offices of Robert Ciampitti, Jr., Boston, MA, for Frank Cousins, Defendant.

Alfred P. Farese, Jr., Law Office of Alfred Paul Farese, Jr., Everett, MA, Thomas J. Muzyka, Clinton & Muzyka P.C., Boston, MA, for David E. Mullane, Joan–Leslie Mullane, Counter Defendants.

Paul L. Kenny, Medford, MA, John F. Lakin, AFSCM Council 93, Boston, MA, Salim R. Tabit, Broadhurst, Lakin & Lakin, Andover, MA, for Adele Chambers, Jean Farese, Counter Claimants.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

The central issue in this case is whether an unrecorded bill of sale purporting to

convey a federally documented vessel, the M/Y Cent'Anni (formerly known as "Lady B Gone"), from David and Angela Murphy (the "Murphys") to Dr. David Mullane ("Mullane") is valid against judgment creditors Adele Chambers ("Chambers") and her mother Jean Farese ("Farese").

Originally, this case was heard in the district court before Judge Keeton, who held a four-day bench trial in December 2001. On June 6, 2002, Judge Keeton issued his opinion in *Mullane v. Chambers*, 206 F.Supp.2d 105 (2002), and entered final judgment in favor of the Mullanes. Chambers and Farese appealed. The First Circuit reversed and remanded the case to the district court for further proceedings. *Mullane v. Chambers*, 333 F.3d 322, 339 (1st Cir.2003). The case has been randomly redrawn to this session of the Court.

The full history of this case is best recounted in Judge Keeton's opinion, *see Mullane*, 206 F.Supp.2d at 107–11, and those seeking more detail would be wise to consult it. For purposes of this limited remand, the relevant background is as follows. On November 24, 1997, Dr. and Mrs. John J. Walsh conveyed the vessel M/Y Lady B. to the Murphys. *Mullane*, 333 F.3d at 325. On December 8, 1997, the Murphys recorded the conveyance with the Department of Transportation pursuant to the United States Vessel Documentation System, 46 U.S.C. §§ 12101–12124, 31321 (2002), and changed the vessel's name to "Lady B Gone." *Mullane*, 333 F.3d at 325. On July 2, 1998, the Murphys sold the Lady B Gone to Mullane, who did not record the bill of sale or conveyance until September 2, 1998. *Id.*

During this time, Chambers and Farese obtained two Massachusetts state court writs of execution against the Murphys for loans made directly to the Murphys and to trucking companies owned by David Mur-

phy. *Id.* at 325–26 & 326 n. 1. Farese had obtained a money judgment for $27,612.00 against the Murphys on November 1, 1996, and Chambers had obtained a money judgment for $70,123.32 against the Murphys on April 22, 1998. *Id.* at 326 n. 1. Chambers and Farese sought to levy on the vessel purportedly owned by the Murphys to satisfy the writs. *Id.* at 325. On the morning of August 28, 1998, the Essex County Sheriff's Department seized the vessel at the Seaport Marina in Lynn, Massachusetts. *Id.* at 326. At the time of the seizure, the Murphys were on board the vessel and the vessel had the name "Cent'Anni" painted on its transom. *Id.* The Sheriff's Department asked the Murphys whether they owned the vessel, and they replied that they had conveyed the vessel back to its former owners, i.e., Dr. and Mrs. Walsh. *Id.* A member of the United States Coast Guard, who had accompanied the Sheriff's Department, confirmed that the Department of Transportation records showed that the Murphys were the registered owners of the vessel. *Id.* At no time during the seizure were the Mullanes mentioned. *Id.*

Five days after the seizure, Mullane recorded the conveyance of the Lady B Gone with the Department of Transportation and changed the vessel's name to "Cent'Anni." *Id.* On September 4, 1998, Mullane and his wife Joan–Leslie Mullane, filed an amended complaint against Chambers, Farese, Sheriff Frank Cousins, the Sheriff's Department, and the Cent'Anni, seeking repossession of the vessel and compensatory damages. *Id.* Chambers and Farese filed an answer and counterclaim on October 5, 1998, seeking to have the transfer set aside as a fraudulent conveyance under Mass. Gen. L. ch. 109A. *Id.*

Judge Keeton held a four-day bench trial in December 2001. *Id.* at 327. He subsequently ruled on June 6, 2002 that

the Mullanes were bona fide purchasers of the vessel as of July 2, 1998 and took the vessel free of any interests held by Chambers and Farese. *Mullane*, 206 F.Supp.2d at 119. The court also ruled that the vessel was damaged while in the Sheriff's care, but that the Mullanes failed to prove the amount of damages and that the Sheriff's Department was immune from damages. *Id.* at 117–118. The court imposed $100,000 in punitive damages against Chambers and Farese, holding that they intentionally disregarded the Mullanes' right to the vessel after learning of the unrecorded sale at the time of the seizure or soon thereafter. *Id.* at 119.

On Chambers and Farese's appeal, the First Circuit held that "the levy of the vessel was proper, and thus Chambers and Farese perfected their interest in the vessel by taking possession of it before the Mullanes had recorded their prior purchase agreement." *Mullane*, 333 F.3d at 329. The court next turned to what it considered "the central issue of the case: whether the recording statute relating to federally documented vessels, 46 U.S.C. § 31321, renders an unrecorded bill of sale or conveyance invalid as against a seller's judgment creditors who levy the vessel without notice." *Id.* at 329–330. The recording statute provides:

> A bill of sale, conveyance, mortgage, assignment, or related instrument, whenever made, that includes any part of a documented vessel or a vessel for which an application for documentation is filed, must be filed with the Secretary of Transportation to be valid, to the extent the vessel is involved, *against any person* except-
>
> (A) the grantor, mortgagor, or assignor;
>
> (B) the heir or devisee of the grantor, mortgagor, or assignor; and
>
> (C) *a person having actual notice* of the sale, conveyance, mortgage, assignment, or related instrument.

46 U.S.C. § 31321(a)(1) (emphasis added). The First Circuit noted that neither party sufficiently briefed the application of section 31321 to this case and that the district court never even mentioned the statute in its opinion. *Mullane*, 333 F.3d at 330. Reading the "plain and unambiguous language of the statute," the court ruled that "the Mullanes' unrecorded bill of sale is invalid against Chambers and Farese *unless* they had actual notice." *Id.* at 330 (emphasis added).

Because Judge Keeton found only that Chambers and Farese had notice of the sale to Mullane either at the time of the seizure or soon thereafter, the district court did not resolve the "crucial question" of "whether they had actual notice either before or at the time of the levy." *Id.* at 333. "Because the district court did not apply subsection 31321(a)(1) and did not make a factual finding as to whether Chambers and Farese had actual notice *at the time of the levy*," the First Circuit remanded the case for further proceedings. *Id.* (emphasis added). The narrow question before this Court, therefore, is whether Chambers and Farese had "actual notice" of the sale to Mullane before or at the time of the levy.[1]

---

1. At a hearing held before this Court on May 10, 2004, the parties agreed that "the time of the levy" is the same as the time of the seizure. This Court also interpreted the terms levy and seizure to have the same meaning in this context. Trial Tr., Vol. II [Doc. No. 218], at 29–30 ("[T]his Court must interpret as matter of law what the two differ-ent words [i.e., levy and seizure] mean. And I will tell you I interpret them as having the same meaning. And in the context of the findings that I must make here, I rule that a seizure or levy is accomplished once all those steps necessary to reduce the asset to the possession of the governmental keepers, that is, here the deputy sheriffs, have been accom-

## II. DISCUSSION

### A. Actual Notice

The issue of whether Chambers and Farese had actual notice of the vessel's sale to Mullane at or before the time of seizure is not entirely new. At the summary judgment stage, the Mullanes argued that Chambers knew that the Murphys had sold the vessel before the seizure, and that this knowledge could be imputed to the Sheriff's Department. Appellants' Record App., Vol. I, at 127. In her deposition testimony, Chambers recounted that she learned from the Coast Guard that the Murphys owned a vessel named the Lady B Gone. Def.'s Designation of Witness Test. [Doc. No. 214], Ex. 11 ("Chambers Dep."), at 33. She went down to the marina prior to the seizure to see if she could find it. Id. at 32. When she asked an unidentified man at the dock whether he knew where she could find the Lady B Gone, the man responded "That boat is no more. The owners have a new boat called the CENT'ANNI." Id. at 31; Appellants' Record App., Vol. I, at 127–28. From this evidence, the Mullanes argued that Chambers knew that the Murphys' vessel had been sold. Id. Considering the testimony in the light most favorable to the nonmovants, Judge Keeton held that proof was lacking that Chambers knew that the Murphys were no longer in possession of the vessel. Id. at 128. "At best," concluded Judge Keeton, "Chambers knew that the Murphys owned a boat and that it was no longer called LADY B GONE." Id.

Unfortunately, the question of whether Chambers and Farese had actual knowledge of the sale of the vessel from Murphy to Mullane before or at the time of the levy was not developed further at the December 2001 trial before Judge Keeton. Therefore, this Court allowed the parties to introduce additional evidence on the limited subject of what, if anything, Chambers and Farese knew about the sale and when. In May 2004, the Court held a two-day bench trial. See Trial Tr., Vol. I [Doc. No. 220]; Trial Tr., Vol. II [Doc. No. 218]. At the close of final arguments, the Court reflected upon the testimony from the bench and found as matter of fact that Chambers and Farese did not have actual knowledge before or at the time of the levy that Murphy had conveyed the vessel to Mullane. Trial Tr., Vol. II, at 30–32.

The Mullanes argue that this finding of fact alone does not dispose of the issue of actual notice. They contend, as matter of law, that the term "actual notice," as it is used in subsection 31321(a)(1)(C), means either actual knowledge or notice implied from the facts. This Court ordered the parties to submit further briefs on this point of law. Trial Tr., Vol. II, at 33. On June 28, 2004, both the Mullanes and Chambers and Farese filed their post-trial briefs. See Pls.' Mem. [Doc. No. 221]; Defs.' Mem. [Doc. No. 222].

The principal case cited by the Mullanes is The Tompkins, 13 F.2d 552 (2nd Cir. 1926), which held that the term "actual notice" in 42 U.S.C.A. § 1012 (1925), a previous incarnation of the Ship Mortgage Act, includes "actual knowledge or notice implied from the facts." Id. at 554. The Second Circuit explained that:

> If a person has knowledge of such facts as would lead a fair and prudent man, using ordinary thoughtfulness and care, to make further accessible inquiries, and he avoids the inquiry, he is chargeable

---

plished. In the specific circumstances of this case, the levy, the seizure, was accomplished once the Murphys had left the vessel with their pets and personal possessions. At that time the vessel was in the custody of the sheriff's department of the County of Essex of the Commonwealth of Massachusetts. The levy or seizure had been completed.").

with the knowledge which by ordinary diligence he would have acquired. Knowledge of facts, which, to the mind of a man of ordinary prudence, beget inquiry, is actual notice, or, in other words, is the knowledge which a reasonable investigation would have revealed. *Id.* (quoting *Fidelity & Deposit Co. v. Queens County Trust Co.,* 226 N.Y. 225, 225–26, 123 N.E. 370 (1919)) (internal quotations omitted). The court made clear that "[a]ctual notice differs from constructive notice, in that the latter is a legal inference from established facts." *Id.* This distinction is significant, as this Court refuses to interpret "actual notice" to include "constructive notice." If Congress had intended such a result, it would surely have used the term constructive notice.

The Court's own research reveals surprisingly few cases that construe or even discuss the term "actual notice" in the Ship Mortgage Act since *Tompkins* was decided in 1926. In their brief, the Mullanes rely in part on *Marsden v. Southern Flight Service, Inc.,* 227 F.Supp. 411 (M.D.N.C. 1961), a case interpreting "actual notice" in the Federal Aviation Registration Act. *See* Pls.' Mem. at 3–5. The *Marsden* court, citing *Tompkins,* 13 F.2d at 553–54, held that "[w]hile actual notice has been used in many senses by the courts, we interpret its use in this statute in a sense broad enough to include knowledge of inquiry-provoking facts as well as express knowledge of the fact in issue." 227 F.Supp. at 416 (footnote omitted). The court explained that "the cases are in accord that [the Ship Mortgage Act] was used by Congress as its model for the Federal Recording Statute Relating to Aircraft." *Id.* In *Shacket v. Philko Aviation, Inc.,* 841 F.2d 166 (7th Cir.1988), another case involving the Fed-

eral Aviation Act, the Seventh Circuit also cited *Tompkins* in holding that actual notice may be notice implied from the facts, also known as "implied actual notice":

> Admittedly, the line between "constructive notice," which is not within the scope of 49 U.S.C. § 1403(c), and "implied actual notice," which is, is a fine one. But "constructive notice" often means no notice, while "implied actual notice" requires (1) actual knowledge of (2) highly suspicious circumstances, coupled with (3) an unaccountable failure to react to them. This in turn is a shade short of the form of actual knowledge that consists of closing your eyes because you're afraid of what you would see if you opened them.

*Id.* at 171. Although *Shacket* interprets the Federal Aviation Act, the Court nonetheless finds its standard for implied actual notice helpful.

■ Even if this Court assumes that "actual notice" under subsection 31321(a)(1)(C) includes notice implied from the facts, the Mullanes fail to show that Chambers and Farese had such notice. The Mullanes contend that Chambers and Farese's knowledge that the vessel's name had been changed from the Lady B Gone to the Cent'Anni prior to the levy, combined with their attorney Salim Tabit's knowledge that the ship's mortgage had been discharged,[2] is sufficient to qualify as notice implied from the facts. Pls.' Mem. at 7–8. The Court disagrees.

Although this Court finds as matter of fact that Chambers knew of the name change before the levy, *see* Trial Tr., Vol. I, at 57 ("Chambers Test."), that by itself does not suggest that the vessel had been sold to Mullane. Chambers could reason-

---

2. The Court has previously held that the knowledge of Chambers and Farese's lawyer before and at the time of the levy is properly imputed to Chambers and Farese. Trial Tr., Vol. II, at 32.

ably have assumed that the Murphys themselves changed the name. Furthermore, the name change appears even less suspicious when viewed in the context of the surrounding events. Despite ample opportunity at the time of the levy, the Murphys never even mentioned the Mullanes as possible owners of the vessel.[3] Any vague suspicions regarding the ownership of the vessel would have been wiped away by the Coast Guard's confirmation at the time of the levy that the Murphys were the recorded owners of the vessel and by the fact that the Murphys were living on the vessel with their pets and personal belongings when the Sheriff's Department arrived to seize the vessel. *See* Trial Tr., Vol. I, at 18–22, 28 ("Medeiros Test.").

With regard to the discharge of the mortgage, the Court makes two observations. First, the discharge of a preferred ship's mortgage in the amount of $100,095 to Eastern Bank, dated July 17, 1998, did not contain the name of anyone other than the Murphys. *See* Trial Ex. 2. That document alone would not necessarily lead one to suspect that it was Mullane who discharged the mortgage. In fact, Tabit presumed that the Murphys had paid off the mortgage themselves and now had sufficient equity in the vessel to satisfy his clients' judgments. Trial Tr., Vol. I, at 66 ("Tabit Test."). Second, and most importantly, even if the Eastern Bank receipt qualified as actual notice of the sale to Mullane, the Mullanes have failed to prove by a reasonable preponderance of the evidence that such notice was attained before or at the time of the levy.

On May 27, 2004, the Court held that "[i]n the specific circumstances of this case, the levy, the seizure, was accomplished once the Murphys had left the vessel with their pets and personal possessions. At that time the vessel was in the custody of the sheriff's department of the County of Essex of the Commonwealth of Massachusetts. The levy or seizure had been completed." Trial Tr., Vol. II, at 30. Both Tabit and David Wentzell of the Essex County Sheriff's Office testified that Tabit did not visit the marina on the day of the levy until after the Murphys had left the vessel. Tabit Test. at 64; Trial Tr., Vol. I, at 39–41 ("Wentzell Test."). Sometime prior to Tabit's arrival at the marina, Deputy Wentzell called Tabit on his cell phone to inform him that someone had suggested that the Murphys had reconveyed the vessel back to its original owners, the Walshes. Tabit Test. at 64–65; Wentzell Test. at 49. It is unclear from the record whether Deputy Wentzell placed this call to Tabit before or after the Murphys had left the vessel. *See* Wentzell Test. at 49–50. According to his own testimony, Tabit was first informed of the mortgage discharge either during that telephone call, or upon his arrival at the marina. Tabit Test. at 66. Drawing all reasonable inferences from this testimony, the Court rules that the Mullanes have not shown by a reasonable preponderance of the evidence that (1) Tabit was first informed about the mortgage discharge during Deputy Wentzell's telephone call, or that (2) Deputy Wentzell called Tabit before the levy was completed. Therefore, the Court cannot conclude as matter of fact that Tabit had knowledge of the mort-

---

**3.** As explained on May, 27, 2004, the Court discredited Murphy's testimony that he told Gilbert Medeiros of the Essex County Sheriff's Office at the time of the levy that he had sold the vessel to Mullane. Trial Tr., Vol. II, at 32; *see id.* at 8, 14 ("Murphy Test."). Even if Murphy's testimony had been credited by the Court, the Court held that it would "not impute or infer any knowledge on the part of the seizing officers to Chambers or Farese." *Id.* at 32.

gage discharge before or at the time of the levy.

By all accounts, the Murphys appeared to be the owners of the vessel at the time of the levy. Chambers and Farese were not burying their heads in the sand; they and their attorney performed an appropriate inquiry into the ownership of the vessel before the levy was accomplished. It was only shortly thereafter that Chambers and Farese learned that the Mullanes had acquired the vessel. *See* Tabit Test. at 71–72. Accordingly, this Court holds that Chambers and Farese had no reason to believe before or at the time of the levy that the vessel had been conveyed from the Murphys to Mullane, and thus had no actual notice of the sale.

### B. Remaining Issues

### 1. Mullane's Payment of the Preferred Ship's Mortgage

Mullane maintains that as part of his purchase of the Murphys' vessel, he paid the entire balance of the vessel's preferred ship's mortgage held by Eastern Bank, totaling $100,095. Having failed to record his bill of sale pursuant to 46 U.S.C. § 31321 before Chambers and Farese perfected their interest in the vessel, Mullane now attempts to minimize his losses by arguing that his payment of the preferred ship's mortgage creates a lien in his favor under the Federal Maritime Lien Act, 46 U.S.C. §§ 31341–43 (1994). *See* Pls.' Mem. at 9–12.

 Under the Federal Maritime Lien Act, "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner ... has a maritime lien on the vessel." 46 U.S.C. 31342(a)(1). Pursuant to the common law rule of advances developed in admiralty, a person may also acquire a maritime lien by making an "advance" on behalf of the own-

er of the vessel to satisfy an outstanding or future maritime lien claim. *See Tramp Oil and Marine, Ltd. v. M/V "Mermaid I,"* 805 F.2d 42, 44–45 (1st Cir.1986).

 As the First Circuit has explained, "[t]he principal concern [of the Federal Maritime Lien Act] is to keep the ship active, thereby facilitating the flow of commerce and protecting the interests of the owners and secured parties." *Payne v. SS Tropic Breeze,* 423 F.2d 236, 241 (1st Cir.1970). Accordingly, "[a] familiar purpose of [maritime] liens is to make readily available to a mobile borrower the secured credit that is often necessary to ensure that a vessel can obtain the basic supplies or services needed for its operation." *Gowen, Inc., v. F/V Quality One,* 244 F.3d 64, 68 (1st Cir.2001); *see also Farrell Ocean Services, Inc. v. United States,* 681 F.2d 91, 92–93 (1st Cir.1982) (holding that the term "other necessaries" in a previous version of the Federal Maritime Lien Act "should be interpreted broadly in order to encourage the provision of services that will keep ships active and consequently have found it to apply whenever the goods or services that were provided to the vessel were necessary for its continued operation"); *Payne,* 423 F.2d at 241 ("The appropriate test [for what items constitute 'other necessaries'] is whether the goods or services in question were necessary to the continued operation of the vessel."). In general, goods and services such as fuel, wharfage, repairs, and the transportation of vessels have been deemed "necessary" under the Act. *See, e.g., Gowen,* 244 F.3d at 67–68; *Tramp Oil,* 805 F.2d at 44; *Farrell Ocean Services,* 681 F.2d at 93.

 Mullane's contention that his payment of the ship's mortgage created a lien under the Federal Maritime Lien Act is unavailing. His payment of the mortgage was not advanced for goods and services necessary for the vessel's operation. *See*

**198**

*Tramp Oil,* 805 F.2d at 44–45. Nor did it further the Act's interests of "facilitating the flow of commerce and protecting the interests of the owners and secured parties." *Payne,* 423 F.2d at 241. Given that "maritime liens are to be strictly construed," *Tramp Oil,* 805 F.2d at 46, the Court declines to extend the Act to cover a mortgage payment made in exchange for the purchase of a vessel.

### 2. Storage Costs and Insurance

In the interest of equity, the Court orders Chambers and Farese to reimburse the Mullanes for all reasonable storage and insurance costs of the vessel incurred since the levy.

### III. CONCLUSION

For the foregoing reasons, the Court rules that the Mullanes' unrecorded bill of sale for the vessel formally known as M/Y Lady B Gone is invalid against Chambers and Farese under 46 U.S.C. § 31321, and that the Mullanes are not entitled to a maritime lien under 46 U.S.C. §§ 31341–43. The Mullanes are, however, awarded reasonable storage and insurance costs in equity.

This result is undoubtedly "a harsh reality for purchasers like the Mullanes." *Mullane,* 333 F.3d at 333 n. 9. Had they simply taken the time to record their bill of sale promptly with the Department of Transportation, they easily could have protected their interests in the vessel. *See* 46 U.S.C. § 31321(a)(1).

SO ORDERED.